JUDGE LIMAN

22 CV 3012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br> **Plaintiff,** <br><br> v. <br><br> **DEAN SHAH, HENRY CLARKE, JULIUS CSURGO, AND ANTEVORTA CAPITAL PARTNERS, LTD.,** <br><br> **Defendants.** | **22-CV-____ (____)** <br><br> **FILED UNDER SEAL** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Dean Shah ("Shah"), Henry Clarke ("Clarke"), Julius Csurgo ("Csurgo"), and Antevorta Capital Partners, Ltd. ("Antevorta") (collectively, "Defendants"):

### SUMMARY

1.      This is a securities fraud enforcement action. Defendants intended to, and did, defraud investors by secretly dumping onto the market large quantities of stock. Defendants did so while concealing that they held large, controlling positions in that stock. The stock, referred to as "penny stocks," was issued by smaller, or "microcap," companies. In furtherance of their scheme, Defendants intentionally circumvented the registration and disclosure requirements at the core of the federal securities laws. Defendants also engaged in trading activity intended to manipulate stock prices, and secretly funded promotional campaigns to stir up investor interest in the stocks of companies that Defendants secretly controlled.

2.      From 2013 through at least 2018 (the "Relevant Period"), Defendants' goal was to secretly gain control of thinly-traded microcap companies, hire stock promoters to generate demand for their shares, and then profit by selling those shares illegally to unsuspecting investors.

3.      Defendants knew of, and purposely flouted, the registration and disclosure requirements of federal securities law.  Before selling stock, control persons are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell.  Also, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.  Ownership of more than five percent of a security registered pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") is a threshold for reporting beneficial ownership under Section 13(d) of the Exchange Act, and is often a threshold used by broker-dealers when evaluating deposits of stock into brokerage accounts.

4.      These registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.  Defendants sought to evade the registration and disclosure rules by concealing their identities -- typically by holding the stock in corporate accounts that served as nominee stock holders -- from the public, brokers, and regulators.  Concealing their identity was key to Defendants' scheme to perpetrate their fraud on investors by secretly dumping their stock into the securities markets.  In effect, their

stock sales appeared as ordinary sales by ordinary investors, when the reality was that these were sales by control persons who were dumping their holdings into the market.

5.     Defendants concealed their control of the securities of Zenosense, Inc. ("Zenosense"). Beginning in 2013, Shah and Clarke controlled Zenosense, both in their control of its outstanding stock and their actual control over its affairs. Shah and Clarke took steps to conceal their majority ownership and actual control, including by dispersing their shares into accounts of various fictional nominee accountholders. They used their control over the company to reduce its number of shares outstanding, thus increasing their controlling interest. Then, in 2016, Shah and Clarke used their secret control over Zenosense to issue new freely tradeable stock to themselves to bolster their domination of Zenosense (and at the same time diluting the value of shares belonging to investors who had previously purchased Zenosense shares).

6.     Also in 2016, Shah and Clarke formed a partnership with Csurgo and his company Antevorta to form a control group that amassed, and concealed control over, 90 percent of Zenosense's total outstanding stock. In carrying out his role in the scheme, Csurgo signed a stock purchase agreement which falsely represented that Antevorta had purchased Zenosense shares, when in fact Antevorta paid nothing for the shares that it received. The reason for Csurgo to sign the stock purchase agreement was to create the appearance of a legitimate acquisition of shares when depositing them at a broker-dealer.

7.     Later, beginning in 2017 when their partnership with Csurgo and Antevorta had ended, Shah and Clarke continued their scheme by forming yet another fictional nominee entity to hold Zenosense shares and disguise their controlling interest.

8.     While they held undisclosed and hidden controlling interests in Zenosense, Defendants engaged in manipulative trading and orchestrated paid promotional campaigns to

3

build investor interest in Zenosense. Defendants then sold their shares to unsuspecting investors as Defendants' efforts led to increasing share prices.

9.     Using similar methods to the Zenosense fraud, Csurgo and Antevorta amassed secret control of Envoy Group Corp. ("Envoy Group"). Csurgo avoided disclosure of his and Antevorta's controlling interest by coordinating with others to disperse Antevorta's shares into multiple accounts that he controlled but that were not all in his or Antevorta's name. Csurgo also orchestrated promotional activity regarding Envoy Group, and engaged in manipulative trading to condition the market ahead of his secret promotions and sales.

10.     Csurgo's fraud extended to his involvement in a group with control over two additional companies. Csurgo in 2017 signed a document purporting to show that Antevorta purchased debt that was convertible to shares of another microcap company called EnviroTechnologies International, Inc. ("EnviroTechnologies"). Antevorta in fact paid nothing for its shares. He also signed a non-affiliation representation letter falsely stating that he was not an affiliate of the issuer. Csurgo signed these documents for the purpose of fraudulently inducing the transfer agent for EnviroTechnologies stock to remove restricted legends from the share certificates. These documents were in fact provided to EnviroTechnologies' transfer agent and the restrictive legends were removed. Removal of the restrictive legends enabled Csurgo and Antevorta to sell their shares into the public market, even though Csurgo's and Antevorta's sales violated the applicable laws regulating sales of shares owned or controlled by control groups. Csurgo also paid for promotion of EnviroTechnologies stock and sold approximately 2.4 million shares from Antevorta's account during that promotional activity.

11.     Csurgo similarly signed two stock purchase agreements related to a fourth microcap company, Drone Guarder, Inc. ("Drone Guarder"), also to create the false appearance

4

of a legitimate transaction that had not occurred. He also paid for a promotional campaign while selling Drone Guarder shares from Antevorta's account.

## VIOLATIONS

12.     By virtue of the conduct alleged herein, Shah, Clarke, Csurgo, and Antevorta violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§77e(a), 77e(c) and 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§240.10b-5(a) and (c)] thereunder, and Csurgo and Antevorta also violated Section 10(b) of the Exchange Act and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)] thereunder, and Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

13.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].

14.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint; (b) ordering Defendants to disgorge any ill-gotten gains with prejudgment interest thereon, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; (d) prohibiting Shah, Clarke, and Csurgo from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. §78u(d)(6)]; (e) barring Shah, Clarke, and Csurgo from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them,

participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Shah, Clarke, and Csurgo from purchasing or selling securities listed on a national securities exchange for their own personal accounts; and (f) ordering such other and further relief the Court may deem just and proper.

15.    The Commission seeks emergency preliminary relief against Csurgo and Antevorta, including a temporary restraining order against further violations of the federal securities laws by Csurgo and Antevorta and an emergency asset freeze to preserve the assets necessary to satisfy an eventual judgment against Csurgo and Antevorta. The Commission also requests a repatriation order to facilitate the return of Csurgo and Antevorta's assets to the United States for eventual distribution to harmed investors.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§77t(d)(1) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa]. Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. A substantial portion of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of New York. Certain individuals who resided in this district purchased shares of the stock at issue during the Defendants' fraudulent schemes.

17.    In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants, directly or indirectly, singly or in concert, made use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails.

## DEFENDANTS

18.    **Dean Shah**, age 53, is a Canadian and U.K. citizen and, on information and belief, resides in Spain.

19.    **Henry Clarke**, age 51, is a U.K. citizen and, on information and belief, resides in Spain.

20.    **Julius Csurgo**, age 66, also known as Gyula Karoly Csurgo, is a Canadian and Hungarian citizen and, on information and belief, resides in Ontario, Canada.  He is the director and beneficial owner of defendant Antevorta.

21.    **Antevorta Capital Partners, Ltd.** is a company that Csurgo incorporated in both Canada and the British Virgin Islands.  Antevorta claims to be a corporate finance and business consulting firm, specializing in helping companies raise capital through debt and equity and assisting companies in reverse mergers and direct listings on U.S. and Canadian markets. Antevorta is owned and controlled by Csurgo.

## RELEVANT ENTITIES

22.    **Envoy Group Corp.** is an inactive Florida corporation last headquartered in Chicago, Illinois.  It was originally incorporated in 2013.  It was quoted and traded on OTC Link operated by OTC Markets Group Inc. ("OTC Link").  At all relevant times, it traded under the ticker symbol "ENVV."  The company changed its name to Black Cactus Global, Inc. on December 4, 2017, and to BLGI, Inc. on October 20, 2020.

23.    **Zenosense, Inc.** was a Nevada corporation headquartered in Valencia, Spain, and is now headquartered in New York, NY.  Zenosense's stock was quoted and traded on OTC Link with the ticker symbol "ZENO."  Zenosense was originally incorporated in Nevada in 2013 as Braeden Valley Mines, Inc.  On November 22, 2013, the company changed its name to

Zenosense.  After a period in which Zenosense was defunct, a Nevada state court on December 8, 2021 granted a petitioner's request for an order appointing the petitioner custodian of Zenosense with authority to revive and reinstate Zenosense as a corporation in Nevada.

24.    **EnviroTechnologies International, Inc.** represents in public filings that it is an organic product company.  EnviroTechnologies (Ticker: ETII) trades on OTC Link.  It was incorporated in Delaware in 1996, and was most recently headquartered in Pleasant Grove, Utah.

25.    **Drone Guarder, Inc.** represents in public filings that it is a security and surveillance company focusing on drone-enhanced security.  Drone Guarder (Ticker: DRNG) trades on OTC Link.  It was incorporated in Nevada in 2012, and was most recently headquartered in Torrance, California.

### BACKGROUND

26.    "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  In addition, stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  Such registration statements are filed with the Commission on Form S-1 and are often referred to as "S-1 registration statements."  The S-1 registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also includes disclosure of any person or group who is the beneficial owner of more than 5% of the company's securities.

27.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

28.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  Thus, when a control person buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

29.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether shares are restricted from resale.

30.     The Over-the-Counter ("OTC") Markets is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.

31.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

## FACTS

### A.     The Defendants' Use of Corrupt Intermediaries

32.     Defendants' fraudulent schemes required the services of corrupt intermediaries to facilitate and disguise Defendants' transactions.  Defendants worked with several illegitimate organizations, each of which the Commission has now sued for fraud, to secretly deposit, hold, transfer, and sell the stocks that Defendants secretly controlled.

33.     Shah and Clarke were clients of the Sharp Group, a Vancouver-based organization run by an individual named Frederick Sharp that was in the business of facilitating illegal stock sales in the public securities markets.  The Sharp Group concealed the identities of its clients like Shah and Clarke by offering an array of services, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; and providing and administering an encrypted communication network.[1]

---

[1] The Commission charged the Sharp Group and several other individuals on August 5, 2021, with violating antifraud provisions of the Securities Act and the Exchange Act as a result of engaging in a multiyear scheme involving the illegal sale of stock of hundreds of publicly traded companies. *See SEC v. Sharp, et al.*, No 21-cv-11276 (D. Mass. filed August 5, 2021).

34.     The Sharp Group also arranged for clients to deposit stock in offshore trading platforms, including one based in Switzerland called Wintercap SA (formerly known as Silverton SA, but referred to herein as "Wintercap"), to obfuscate the control persons' association with their public company stock.[2]  Shah and Clarke had Wintercap accounts through the Sharp Group, and later engaged directly with Wintercap.

35.     The Sharp Group configured and provided to its clients devices that the Sharp Group referred to as "xPhones," which were designed to be used only for communications on the Sharp Group's encrypted communications network.  The Sharp Group issued xPhones to Shah and Clarke, and Shah and Clarke used those devices, with codenames, to communicate with each other, and with Sharp and others who also used xPhones and codenames.  Shah and Clarke used xPhones and codenames because they were engaged in fraudulent conduct and took steps to conceal that conduct.

36.     Csurgo deposited stock into accounts that he had set up in Antevorta's name at Wintercap.  He also deposited stock into Antevorta accounts at Blacklight SA, which was another overseas entity that was in the business of helping users conceal their ownership of securities before dumping them.[3]  Csurgo also, in January 2017, coordinated to fabricate a stock purchase agreement for a purported stock acquisition from a Sharp Group nominee entity.

---

[2] The Commission charged Wintercap SA and its principal, Roger Knox, on October 2, 2018, with violating the antifraud provisions of the Securities Act and the Exchange Act as a result of engaging in a multiyear scheme involving the illegal sale of stock of at least 50 publicly traded companies. *See SEC v. Knox, et al.*, No. 18-cv-12058 (D. Mass. filed October 2, 2018).

[3] The Commission charged Blacklight in January 2020.  *See SEC v. Bajic, et al.*, No. 20-cv-00007 (S.D.N.Y., filed Jan. 2, 2020) and *SEC v. Ciapala, et al.*, No. 20-cv-00008 (S.D.N.Y., filed Jan 2, 2020).

B. **The First Part of the ZENO Scheme: Shah and Clarke Gain Control, Consolidate Shares, Promote, and Trade**

Shah and Clarke Take Control of ZENO

37.     In August 2012, Zenosense's predecessor, Braeden Valley Mines, Inc., registered for public sale 15 million shares of its common stock on Form S-1.  The 15 million registered shares were previously owned by two Panamanian directors of the corporation who retained an additional 15 million restricted shares.  The 15 million shares issued pursuant to the registration statement were held in the names of individual Panamanian investors.  On April 15, 2013, the company filed its annual report on Form 10-K with the Commission, confirming that there were 30 million shares outstanding.

38.     Accounting records of the Sharp Group reflect that by April 2013, Shah and Clarke in fact controlled all 30 million Braeden Valley Mines shares.

39.     In late 2013, Shah and Clarke exercised their control over Braeden Valley Mines to enter into a licensing agreement, carry out a stock split, and change its name to Zenosense. Shah and Clarke engaged a lawyer for the company in connection with the transaction, and they took steps to acquire signatures from purported Braeden Valley Mines directors to approve the corporate actions and to obtain sufficient proxy votes from purported shareholders to approve the name change to Zenosense and other corporate actions.  Braeden Valley Mines announced its name change to Zenosense effective as of November 22, 2013, and authorized a 2-for-1 stock dividend.

40.     Shah and Clarke were affiliates of Zenosense by virtue of their control over the vast majority of Zenosense shares and their direct control over Zenosense's affairs.

41.     In connection with the November 2013 corporate actions, Clarke wrote to Sharp on October 22, 2013 to ask if the new share certificates resulting from the share dividend should

be mailed directly to the nominal shareholders. Sharp responded "Nooo. Never." Sharp instructed that instead the share certificates should be sent to a lawyer who would forward them to the Sharp Group. Clarke responded that he had been working on the transaction with a lawyer who was "quite straight which is the concern and I don't want to request something that could cause problems." Sharp responded that Clarke should find a lawyer who would accept delivery of the share certificates from the transfer agent, and then send them on to the Sharp Group. Sharp explicitly told Clarke that the reason for this layering was to insulate the Sharp Group "if the sec investigates this company" because the "sec will not bother the lawyer."

42.     Braeden Valley Mines' Panamanian directors resigned in connection with the November 2013 transaction and surrendered their previously issued shares. The cancellation reduced the number of shares outstanding, and made more valuable the shares that Shah and Clarke now controlled. Clarke worked with the Sharp Group to process the cancellation of the Panamanian directors' shares. On December 4, 2013, Clarke wrote to the Sharp Group about the pending "stock retirement for the 2 directors of Braeden" and asked "how quick this can be done as there is an 8k going out tomorrow and it would be good to include it if it goes ahead." The Sharp Group asked Clarke for "instruction on how many shares u want to cancel." Clarke wrote that the directors should each "retire down 21750000 each" (a total of 43,500,000 shares). On December 6, 2013, Zenosense filed a Current Report on SEC Form 8-K announcing the departure of two prior directors of Braeden Valley Mines and stating that they "agreed to surrender as a contribution to the capital of the Company an aggregate of 43,500,000 shares of common stock."

43.     After the cancelation of the prior directors' shares and the stock dividend, Zenosense had just over 48 million total shares outstanding, and Shah and Clarke, through the Sharp Group, controlled 45 million of those purportedly free-trading shares.

44.     The cancelation of the Panamanian directors' shares left the nominee entities through which Shah and Clarke held their shares holding higher proportions of the remaining outstanding shares. On December 6, 2013, the Sharp Group contacted Shah and Clarke with a concern that each nominee account was going to be in excess of the five percent threshold and "[w]e have no room to move the stock as every account had it." Ownership of more than five percent of a security, like Zenosense, registered pursuant to Section 12(g) of the Exchange Act is a threshold for reporting beneficial ownership under Section 13(d) of the Exchange Act. That five percent threshold is used by broker-dealers when evaluating deposits of stock into brokerage accounts. On December 8, 2013, Clarke wrote to Shah about the timing of the "cancellation of the director shares" and "running the risk" of carrying positions in excess of five percent.

45.     Shah and Clarke expressed concern about accounts holding greater than five percent of Zenosense's shares when they were about to start a promotional campaign to secretly pump up Zenosense's share price. Shah wrote to the Sharp Group on December 6, 2013, "[w]e were just about to start promoting on Monday bought and paid for, how long will this take to sort out?" Another example occurred on December 9, 2013, this time with Clarke writing to the Sharp Group to confirm that a nominee entity would be under the five percent threshold, asking "what do u think the timeframe is as the promo needs to be rescheduled to start as soon as the cancellation is done?"

46.     Shah then delayed the planned promotion of Zenosense until 2014. In March 2014, he reached out to the Sharp Group to ensure that the stock placement issues were resolved

14

because "I am trying to coordinate promo and everything needs to be in place prior to kicking off." Shah then instructed the traders who worked for Sharp to begin trading activity in Zenosense in April 2014, selling during the promotion the shares that he and Clarke had amassed.

47.     After Braeden Valley Mines changed its name to Zenosense in late 2013, Zenosense purportedly appointed a new CEO, but it was in actuality Shah and Clarke who continued to control the company. In August 2014, a market regulator, the Financial Industry Regulatory Authority ("FINRA"), asked to speak with Zenosense management regarding promotional activity (directed by Shah and Clarke) related to its common stock. Faced with regulatory interest that could unravel their scheme, Shah orchestrated an arrangement to prepare written responses to FINRA after consulting with Sharp. On August 9, 2014, he wrote to Sharp, "[r]equest came in from finra wanting to speak to management- it is voluntary however obviously not going to ignore it. Last thing we need is the ceo speaking to them and counsel has advised writing back and asking them to submit questions in writing as a verbal interview will be difficult due to language barriers. Not sure if you have heard about these requests on other deals but if you have any feedback on what they are really after and the best way to handle it would be much appreciated." An August 11, 2014 email to FINRA, purportedly from Zenosense's nominal CEO, claimed that English was not his first language and that he would respond to written questions. On August 12, 2014, Shah wrote to Sharp, "Finra have come back with a dirty laundry list of 25 questions long," including questions about the history of the Braeden Valley shell company. Only Sharp could answer FINRA's questions because Sharp previously controlled the Braeden Valley shell company.

48.     Clarke's direct control over Zenosense included his taking steps to arrange for a new auditor for Zenosense. He wrote to Sharp on January 8, 2014, "[g]oing to change auditor on zeno- will require prior auditors to reissue their reports and provide reps letters. New auditor has offered very good price to reaudit 2012 balance sheet and inception to date income statement which avoids this and is the preferred option- can you see any issues with this and who has done the bookkeeping to date as I will need to contact them." Also, in September and October 2014, Clarke took steps to change Zenosense's transfer agent, writing to the Sharp Group "looking to change TA" as Zenosense's existing transfer agent "cannot do dwac." DWAC is a reference to transferring stock via the electronic "Deposit & Withdrawal at Custodian" method. Clarke wrote to Sharp on October 21, 2014, "Zeno is in process of changing TA."

Shah and Clarke Promote ZENO While Concealing Their Ownership

49.     To create the false appearance that Zenosense's shares were beneficially owned by independent shareholders, rather than consolidated with Shah and Clarke, Shah and Clarke took steps to hold the stock in the names of several offshore nominee entities. Beginning in September 2013, the Sharp Group deposited the shares accumulated by Shah and Clarke into various offshore brokerage accounts in the names of nominee entities.

50.     Zenosense shares were registered with the Commission under Section 12(g) of the Exchange Act as of April 23, 2013. By holding the stock in blocks of less than five percent, in the names of nominee entities administered by Sharp, Shah and Clarke avoided (i) affirmative obligations to file with the SEC required reports of beneficial ownership and (ii) screening by transfer agents, broker-dealers, and other market participants who exercised special scrutiny over sellers holding five percent or more of a company's stock.

51.     In 2013, while actively concealing their control over Zenosense, Shah and Clarke began to orchestrate a promotional campaign to pump Zenosense's stock price. Shah and Clarke used the Sharp Group to incorporate a Belize entity, called Rolling Media Solutions, Inc. ("Rolling Media"), to act as an intermediary to pay for promotions of Zenosense without revealing that Shah and Clarke were behind the promotions. This part of the scheme meant that Rolling Media was listed as the paying party in disclaimer language on written promotions, concealing that undisclosed controlling shareholders, Shah and Clarke, were actually behind the promotional material.

52.     Shah and Clarke discussed steps to conceal their involvement with promotional websites regarding Zenosense. For instance, on April 16, 2014, Clarke wrote to Shah about taking steps to mask ownership of promotional websites: "someone has to set up a google account- I am not going to do it from my home ip- if you have an internet shop anywhere near you that would be the best bet and do it using [the name and address of Rolling Media's purported beneficial owner] if it will allow you without a phone number- I can do it from a shop tomorrow at some point although mexico would be better…. If they want a phone number just google a flower shop in belize [where Rolling Media was incorporated] and use that."

53.     On January 25, 2014, Shah wrote to Clarke regarding Zenosense proposing a boiler room to "start flogging this stuff." A boiler room refers to an arrangement for the use of high-pressure sales tactics in cold calls to potential investors.

54.     On April 1, 2014, Shah wrote to one of the Sharp Group in-house traders regarding Zenosense that he was "[l]ooking to kick some promo off soon also get some news out."

55.     In early April 2014, Shah engaged in cross-trading Zenosense shares, a fraudulent

market manipulation practice commonly used to give a false appearance of active trading in a

stock. Shah wrote to a trader on April 4, 2014, "[l]et's cross 5k shares @ .75." On Monday,

April 7, 2014, reported trading in Zenosense shares was over 10 times the volume from the prior

Friday. Shah and Clarke sold a total of 70,500 shares for proceeds of approximately $49,000 on

April 7, 2014.

56.     Shah directly oversaw the trading in Zenosense shares during 2014 and 2015,

providing detailed trading instructions to the Sharp Group traders on a daily basis. For example,

on November 7, 2014, the Sharp Group trader reported to Shah regarding Zenosense: "[s]old

684,000 so far (Exactly 50% of volume)." Shah responded "Great work."

57.     Shah and Clarke actively engaged with promoters, including by reviewing and

editing the content of promotional materials. For example, on April 21, 2014, Clarke wrote

about the content of a promotion and noted that he would "do a cut and paste and make those

changes." On May 12, 2014, Clarke wrote to Shah that he should access a Rolling Media email

account and review draft promotional material that Clarke had saved there.

58.     On August 7, 2014, Shah wrote to Clarke regarding a promotion:

> Not sure if we need to edit the disclaimer? Also we need to change
> the "initial profit target;$8.00" It would be consistent to the
> landing page it was $5.00, And instead of profit target Should read
> long term or mid term, something like that Also in that box the
> symbol should read ZENO:OTCQB And I don't like the logo up in
> the image at the top of page, he should move it down to that box
> where he has all the buy recommendations in, ie: Immediate buy in
> red Company logo below Symbol: ZENO:OTCQB
> Recommendation strong buy below: $1Longer term target $5.00

59.     On October 3, 2014, Shah sent from his email account to a promoter a "final

creative" for mailing. Attached was an investor newsletter that claimed Zenosense was a "rare

18

ground-floor opportunity in breakthrough medical technology." It urged potential investors that "Now is the Time to Act!" and "ZENO could rocket above $5.00 this year...and if you act quickly, you may be able to get in today for under $1.00!"

60.     Shah and Clarke directed Wintercap (then known as Silverton), which controlled several of the Sharp Group-administered brokerage accounts, to sell shares during the promotions that they orchestrated. For example, on June 25, 2015, Clarke wrote to Wintercap asking it to offer to sell Zenosense shares at $0.95 and to sell 20,000 shares "at that level for starters."

61.     In 2014 and 2015, Shah and Clarke, through nominee entity accounts administered by the Sharp Group, sold approximately 6.6 million shares of Zenosense during a promotional campaign for total proceeds of approximately $2.3 million.

62.     Shah and Clarke were affiliates of Zenosense. Their stock sales were thus subject to registration pursuant to Section 5 of the Securities Act, but Shah and Clarke did not register their sales. By fraudulently concealing their control and ownership of the shares, and by fraudulently arranging to have restricted legends removed from their shares, Shah and Clarke were able to sell their stock directly into the market, in violation of the Securities Act.

### C.     The Second Part of the ZENO Scheme:  Shah and Clarke Partner With Csurgo and Antevorta to Amass More ZENO Shares and Conceal Their Ownership

63.     Shah and Clarke stopped selling Zenosense through the Sharp Group in July 2015 and established a direct relationship with Wintercap and its principal, Roger Knox. In August 2015, Knox incorporated an entity called Agron Capital SA ("Agron") in the Marshall Islands and listed Shah as the beneficial owner. Agron's account at Wintercap received over 2 million shares of Zenosense from Sharp Group-administered accounts in October 2015. On October 9, 2015, Sharp wrote to Wintercap (then known as Silverton), copying Clarke, "[w]e have

19

transferred usd53,618 to silv for agron, and have booked out 3 zeno positions in Q . . . Pls transfer these positions to agron's account at the brokers." Q was a reference to the Sharp Group's internal accounting system.

64.    Beginning in May 2016, Shah circuitously moved money to a nominee entity that Shah and Clarke controlled for that entity to purchase additional Zenosense shares. Shah instructed Wintercap to transfer approximately $155,000 from his Agron account to another Wintercap client, Richmont Capital AG, on May 27, 2016. Once the money was in the Richmont Capital account, two wires totaling $152,000 were sent to a Canadian lawyer. This transfer was documented in a loan agreement between Richmont Capital as lender and a Panamanian entity, Valley Heights, Inc. as borrower. The funds wired to the Canadian lawyer were immediately sent to a New York law firm acting as counsel for Zenosense for Valley Heights' purchase of 61,126,578 restricted shares of Zenosense issued on June 8, 2016. This purchase, funded circuitously by Shah through multiple nominee entities and law firm trust accounts, represented the majority (57.5%) of Zenosense's outstanding shares according to a Schedule 13D filed on behalf of Valley Heights on June 16, 2016.

65.    Shah and Clarke controlled the Valley Heights shares, and therefore, controlled Zenosense. Wintercap held the Valley Heights' share certificate in its safe in Switzerland on behalf of Shah and Clarke and took direction from Shah and Clarke regarding the shares. After securing the restricted control block, Shah and Clarke, through their nominee, Valley Heights, used their majority position to vote for a 1-for-7 reverse split of Zenosense's common stock which was effective as of August 4, 2016. This allowed Shah and Clarke to reduce the number of shares held by existing investors and to concentrate their control over Zenosense by reducing the number of shares outstanding in the market.

66.     Shah and Clarke then partnered with Csurgo and Antevorta and others to create a control group to pump and dump Zenosense shares.  As of December 31, 2016, just before the start of a promotional campaign that Csurgo sponsored, Shah, Clarke, Csurgo, and others in the control group with whom they coordinated, in the aggregate controlled over 90 percent of Zenosense's total outstanding stock.

67.     Like Shah and Clarke, Csurgo and Antevorta were affiliates of Zenosense by virtue of their participation in the Zenosense control group.

68.     Beginning in January 2017, Shah, Clarke, Csurgo, Antevorta and others in the control group with whom they coordinated, worked together to deposit purportedly unrestricted Zenosense stock with Wintercap and Blacklight.  They then acquired additional Zenosense stock by converting previously issued Zenosense debt, held by Shah and Clarke, into stock.  This step in their scheme provided the defendants with additional shares to sell into a Zenosense market that they now controlled.

69.     On January 31, 2017, Shah transferred the 809,685 shares of Zenosense he held through Agron at Wintercap to Antevorta's Wintercap account.  Csurgo signed and sent a share purchase agreement to Wintercap to support the purchase, listing consideration paid of $12,700. There is no record of any such payment in Antevorta's bank records, or in Wintercap's records for its Agron and Antevorta accounts.

70.     Blacklight maintained a copy of a written "Agreement" memorializing the terms among Shah and Clarke and those working in concert with them to pump and dump Zenosense shares.  The Agreement referenced Agron's (Shah's) 809,635 Zenosense shares "on deposit at [Wintercap]."  The Agreement provided that Agron (Shah) and others in the group had agreed to combine their efforts through a "best efforts marketing campaign to generate enough sales to

complete the campaign within 6 months or less." It further provided that promotional materials would be sent to Agron (Shah) "for review before being displayed online." According to the Agreement, Agron (Shah) was informed that the campaign would "commence with phone marketing" and have a starting "price point" of "$0.80 to $1.20."

71.     On January 19, 2017, Shah and Knox were parties to an encrypted chat discussing plans to condition the market, through manipulative trading, for a Zenosense promotional campaign that would include a boiler room. In the chat, another member of the Zenosense control group wrote that he would start to "frame the market and prepare for kick off on [the] program" and that he was waiting for instructions from the "room manager," a reference to a boiler room operator. Knox responded, "too much info" and added a wink emoji, ";)."

72.     In February 2017, Csurgo deposited 525,003 shares of Zenosense into Antevorta's account at Blacklight. Transfer agent records and stock purchase agreements show the shares were purportedly acquired from two of the original Panamanian S-1 holders and one of the Sharp Group-administered nominee entities for $0.10 per share. Csurgo signed stock purchase agreements in support of the deposit. In reality, Csurgo and Antevorta had acquired all of their shares from Shah and Clarke.

73.     On February 17, 2017, Csurgo received an email from a trader ("Individual A") who executed trades in Antevorta's accounts for Csurgo, that detailed the terms of Zenosense sales between Antevorta and an account controlled by Shah at Wintercap, noting that the Zenosense shares would be sold from the Shah-controlled account and proceeds would be split 50-50 with Antevorta unless Csurgo and Shah agreed otherwise. On March 20, 2017, Wintercap sent Csurgo an email that attached a report of Antevorta's sales of Zenosense, and Wintercap also included Shah (via Agron) as a recipient of the email.

74.     To facilitate his acquisition of Zenosense stock, Csurgo signed a series of fabricated stock purchase agreements purporting to show that Antevorta had obtained its shares in bona fide, arms-length transactions. In reality, he had obtained them from other members of the group, including Shah and Clarke, as part of their fraudulent scheme to defraud investors by promoting and then selling Zenosense stock. As Csurgo knew, recklessly disregarded, or should have known, depositing broker-dealers often require documentation of how a depositing shareholder acquired shares, as part of the broker-dealers' compliance procedures to determine that the transaction is not part of an unlawful distribution.

75.     On February 24, 2017, Csurgo acquired 289,229 shares of Zenosense from a Sharp Group nominee entity and deposited the shares in an Antevorta account at Wintercap. He signed a stock purchase agreement dated February 22, 2017 to acquire the shares, but the purchase price reflected a substantial premium over the market price with no apparent economic rationale. There is no record of any such payment in Antevorta's bank records or accounting records for the seller, which was a Sharp Group-administered nominee entity. Csurgo signed the stock purchase agreement because Wintercap required formal documentation of the acquisition of shares. Wintercap ultimately sent this fake stock purchase agreement to the depositing broker-dealer because the depositing broker-dealer required documentation of how the shares were acquired, in keeping with its obligation to make an inquiry to determine that it was not part of an unlawful distribution.

76.     Csurgo used the Antevorta bank account he controlled to fund a $311,000 campaign to promote Zenosense between February 10, 2017 and May 31, 2017. After virtually no trading since August 2016, Zenosense's share price and trading volume increased

23

substantially during the promotion, peaking at $3.50 per share on over 6 million shares traded on April 10, 2017:



77.    Between February 13, 2017 and April 10, 2017, Shah, Clarke, Csurgo, and others with whom they coordinated, sold over 6.3 million Zenosense shares, generating proceeds of approximately $7.9 million.

78.    Shah, Clarke, Csurgo, and Antevorta failed to register their stock sales pursuant to Section 5 of the Securities Act.  Therefore, their Zenosense stock should have been restricted from resale, because Shah, Clarke, Csurgo, and Antevorta were Zenosense affiliates.

### D.    The Third Part of the ZENO Scheme:  Shah and Clarke Create Their Own Nominee Entity and Continue the Scheme

79.    Between June 2017 and September 2018, Shah and Clarke continued to deposit shares of Zenosense into nominee accounts held at Wintercap, with each account holding less than five percent, and they sold almost 9 million shares for proceeds of $3.2 million during this time period.

24

80.     By June 2017, Shah and Clarke were no longer partnering with Csurgo and Antevorta to pump and dump Zenosense shares.  Shah and Clarke continued their Zenosense fraud, but now needed a new entity to hold positions below five percent and conceal their ongoing control.

81.     On July 10, 2017, Wintercap incorporated a new entity, Nerima Capital SA ("Nerima") in the Marshall Islands on behalf of Shah and Clarke.  The purpose of this new entity was to hold Zenosense shares belonging to Shah and Clarke, while remaining below the five percent threshold.  Shah and Clarke provided Wintercap with the name and passport of a person who was identified as the beneficial owner of Nerima.  In reality, Shah and Clarke maintained trading authority over the Nerima account.

82.     On July 14, 2017, Shah wrote to Wintercap regarding Nerima and asked who would be the new company's directors.  Wintercap responded, "[s]ame as agron."  Shah then wrote, "that is a problem as the directors will then have control of over 5 percent and it breaks the terms of the Agron debt conversation agreements."

83.     Wintercap, acting at the direction of Shah and Clarke, arranged the paperwork to transfer Zenosense shares from existing purported shareholders into Nerima's name.  On July 14, 2017, Wintercap wrote to Shah to ask how Nerima would acquire its shares of Zenosense.  Shah responded that Wintercap already possessed the share certificates.  Wintercap responded that it held eight share certificates in its safe for Zenosense, including the Valley Heights restricted shares, and asked "which cert do you want to have Nerima acquire?"  Shah responded, "[u]se the ones that are free trading, there are some that are restricted, that amount should be under 5%" and further explained, "[y]ou should have 4 free trading certs and back up docs" totaling 907,146 shares.  Shah then provided the names of the shareholders including one Sharp Group-

administered company and three of the original Panamanian S-1 shareholders.  On July 25, 2017, Nerima's account received the first deposit of 907,146 shares as Shah instructed.

84.     Shah continued to direct promotional activities regarding Zenosense.  On July 20, 2017, Shah wrote to Wintercap that he was "trying to schedule media for next week" and asked when he would be able to start trading.  In an October 17, 2017 encrypted chat, Shah wrote to Wintercap that the Zenosense promotional campaign was a "long term program and promo can be stopped slowed down or speeded up at any time."  As before, Shah and Clarke continued to control Zenosense's operations, as well as controlling its stock.  Indeed, Shah took steps to make sure that Zenosense's purported management was excluded from key developments in the promotion of the company's stock.  On November 7, 2017, Shah received an email from a promoter asking if the promoter should run an article by Zenosense management to make sure it was correct.  Shah responded "[n]o please don't send anything to the company.  I will review it shortly and approve."

85.     Shah and Clarke directed Wintercap to sell shares held by the Agron and Nerima accounts during the promotions that they orchestrated.  For example:

        a.  In November 2017, Shah complained to Wintercap that its traders had not unloaded shares when they were trading at a price that Shah desired. Wintercap wrote to Shah on November 6, 2017, "[w]e have already exceeded 20% of daily market volume.  We sold 20k early.  Then our offer was suppressing the market all afternoon."  Wintercap also warned Shah, "[t]his deal has already been flagged, meaning we lost our best route to market."

        b.  On December 13, 2017, Clarke wrote to Wintercap, "[c]an you send through stock balances for [the Agron and Nerima] accounts."  Once he received them, he requested that Wintercap "offer 10k at 0.27 zeno" from the Agron account. Once Wintercap completed that trade, Clarke wrote "hang back for time being."  He later directed Wintercap to sell at .265 and to "[k]eep going until advised."

        c.  On December 15, 2017, Clarke instructed Wintercap regarding the price at which to offer Zenosense shares, and then to "[t]ap the bid [price] for 200k

[shares]" when it reached $0.25 per share. Wintercap asked "[o]n a daily volume of 300k?" and Clarke replied "Y."

    d.  On January 8, 2018, Shah wrote to Wintercap asking if Agron's account could start trading, because the Nerima account "must be close to being flat[.]"

86.     Shah and Clarke deposited a total of 9,104,716 Zenosense shares with Wintercap from July 2017 through June 2018. They deposited 2,831,002 shares into the Nerima account and the balance, 6,237,714, into Shah's Agron account. Between June 2017 and September 2018, Shah and Clarke sold 8,962,059 shares of Zenosense, generating another $3.2 million in trading proceeds.

87.     Shah and Clarke failed to register these stock sales pursuant to Section 5 of the Securities Act. Therefore, their Zenosense stock should have been restricted from resale because Shah and Clarke were affiliates of Zenosense.

### E.    The Envoy Group Scheme: Csurgo and Antevorta

88.     Between late 2016 and mid-2017, Csurgo engaged in a scheme to defraud investors and securities intermediaries, by concealing his ownership of stock in another microcap company, Envoy Group. He arranged to hold Envoy Group stock in multiple accounts at Wintercap, including an account in Antevorta's name. He sold Envoy Group stock from Antevorta's account, and reloaded the Antevorta account from other accounts where the stock was "parked," thereby ensuring Antevorta's account on its own never exceeded the five percent threshold used by broker-dealers when evaluating deposits of stock into brokerage accounts. While using multiple accounts to conceal the amount of Envoy Group stock that he owned, Csurgo funded a promotional campaign to tout Envoy Group's stock and increase the proceeds from his illegal sales.

89.     In September 2013, Envoy Group had registered on Form S-1 the public sale of 3,000,000 shares of common stock. Envoy Group issued the 3,000,000 shares to 22 individual

27

investors in October 2013. Effective October 22, 2014, Envoy Group executed a 10-for-1 forward split of its common stock, increasing to 30,000,000 the number of purportedly unrestricted shares.

90.     In December 2016, Individual A began to arrange the transfer of 7,000,000 Envoy Group shares to Antevorta's account at Wintercap. Wintercap responded that it could not accept the shares into Antevorta's account because it would "create a situation whereby the client is holding in excess of 5% of outstanding shares." To avoid Antevorta's account holding over five percent of Envoy Group's outstanding shares, Individual A agreed to hold for Antevorta half of the shares (3.5 million) in his own account at Wintercap.

91.     In January 2017, Csurgo and Individual A coordinated to finalize a fabricated stock purchase agreement purporting to document Individual A's purchase of Envoy Group shares from a Sharp Group nominee entity. The stock purchase agreement was a sham, because Individual A never paid or intended to pay for the Envoy Shares that were transferred to his account. Instead, Individual A accepted the shares in his account in order to park them for Csurgo.

92. As of mid-January 2017, a close associate of Csurgo ("Individual B") had acquired approximately 2.2 million shares of Envoy stock in the account of an entity that the associate controlled. Individual A had trading authority over his own, Antevorta's, and Individual B's accounts and all Envoy shares in all three accounts were held for Antevorta's benefit. These 2.2 million shares, combined with the 7 million shares held in the accounts of Antevorta and Individual A, represented approximately 11 percent of the total Envoy Group stock outstanding at the time and approximately 40 percent of the float (the amount of purportedly unrestricted shares on deposit with broker-dealers). Individual A retained trading authority over all three

28

accounts. Collectively, Csurgo, Antevorta, Individual A, and Individual B constituted a control group in Envoy Group.

93.     Csurgo orchestrated a promotional campaign to create market demand for Envoy Group stock before he began selling shares.  Csurgo, from Antevorta's bank account, funded a $523,000 promotional campaign for Envoy starting on July 5, 2017.  Csurgo's payments were to a stock promoter with which Csurgo, on behalf of Antevorta, had executed an "exclusive marketing contract."

94.     Csurgo engaged in or directed manipulative trading to support the price of Envoy Group stock during the promotional campaign.  He used an Antevorta account at Blacklight to buy stock while at the same time selling stock from an Antevorta account at Wintercap, as summarized in the table below:

| | Antevorta Account @ Wintercap | | Antevorta Account @ Blacklight | |
|---|---|---|---|---|
| Date | Quantity Sold | Average Price Per Share | Quantity Purchased | Average Price Per Share |
| 7/13/2017 | 123,237 | $0.46 | 15,000 | $0.47 |
| 7/17/2017 | 305,000 | $0.53 | 20,000 | $0.54 |
| 7/18/2017 | 470,724 | $0.57 | 10,000 | $0.56 |
| 7/20/2017 | 890,000 | $0.71 | 11,400 | $0.70 |

95.     Csurgo's promotional and trading efforts were successful.  Envoy's stock price climbed from around $0.30 per share in early July 2017 to a peak of over $0.80 per share by July 21, 2017.  Trading volume exceeded a million shares over 30 times as illustrated by the chart below.



96.     By July 20, 2017, Csurgo sold nearly all of the 3,500,000 shares in Antevorta's

account, generating proceeds of approximately $2 million.  On July 21, 2017, Individual A

transferred 3,500,000 shares of Envoy stock that were parked in his account to the Antevorta

account.  To support the transfer, Csurgo and Individual A signed a stock purchase agreement

purporting to show that Antevorta paid $5,000 as consideration for the shares.  Csurgo did pay

$5,000 to Individual A, but it was merely compensation for holding the shares in his account as

opposed to arms-length consideration for the purchase of the shares.  The $5,000 price in the

stock purchase agreement represented a 99.8% discount from the closing price of Envoy stock on

the day of the transfer.  If Individual A had actually controlled the shares, he could have sold

them in the market, which was highly liquid due to the ongoing promotional campaign, for a

much higher profit.

97.     Once the Antevorta account was reloaded with Individual A's shares, Csurgo

immediately began dumping more Envoy shares, generating another $1.2 million in proceeds

between July 21 and July 31, 2017.  Reloading again when Antevorta's account was nearly out

30

of Envoy stock, on August 1, 2017, Csurgo had 2,196,089 shares of Envoy transferred to Antevorta's account from the account of Individual B. The stock purchase agreement documenting this transfer also included consideration of $5,000, again reflecting a nonsensical discount from market price.

98.    In total, between June 23, 2017 and September 11, 2017, Csurgo, through Antevorta's accounts at Wintercap and Blacklight, sold 9,196,089 shares of Envoy Group stock for proceeds of approximately $3.8 million.

99.    Csurgo, and Antevorta failed to register their stock sales pursuant to Section 5 of the Securities Act. Therefore, their Envoy Group stock should have been restricted from resale, because Csurgo and Antevorta were Envoy Group affiliates as a result of their connection to the control group.

**F.      Additional Fraudulent Conduct, 2017-2018:  Csurgo and Antevorta**

EnviroTechnologies International, Inc.

100.    Csurgo signed a document dated April 24, 2017 on behalf of Antevorta purporting

to show that Antevorta purchased debt convertible to shares of EnviroTechnologies for $1,000.

In reality, Antevorta did not pay anything to purchase the debt.  Instead, Antevorta received the

debt instrument for free, in exchange for funding promotions of EnviroTechnologies for an

undisclosed control group that was secretly dumping its shares into the market.  Again, Csurgo

signed the purported acquisition agreement to make it look as though Antevorta's acquisition of

the debt took place via a bona fide transaction, even though it had not.

101.    A significant percentage of EnviroTechnologies' stock was controlled by Timothy

Page[4] and other members of his undisclosed control group.  As part of Page's scheme, Csurgo

used Antevorta's bank account to fund a $223,000 promotional campaign for

EnviroTechnologies stock, which ran from April through October 2017.  Later, in October and

November 2017, Csurgo, through Antevorta's bank account, paid over $517,000 to a boiler room

operator that was working with Page to liquidate EnviroTechnologies' stock.

102.    In May 2017, in connection with his role in promotional activities, Csurgo

converted the purportedly acquired debt into ten million shares of EnviroTechnologies' stock,

which he deposited into Antevorta's brokerage account.  No payment for the purported debt

acquisition is reflected in Antevorta's bank records or the records of the purported seller.  As

Csurgo knew, recklessly disregarded, or should have known, Page's associate provided the

---

[4]  The Commission charged Page, his son, Trevor Page and an officer and director of EnviroTechnologies, William
Shupe, on September 23, 2021 in connection with this scheme.  *See SEC v. Page, et al.*, No. 1:21-cv-05292
(E.D.N.Y., filed Sept. 23, 2021) and *SEC v. Cattlin, et al.*, No. 1:21-cv-05294 (E.D.N.Y. filed Sept. 23, 2021).  The
Commission also charged the scheme's boiler room operator on July 17, 2019.  *See SEC v. O'Rourke, et al.*, No. 19-
cv-4137 (E.D.N.Y. filed July 17, 2019).

fabricated assignment agreement to EnviroTechnologies' transfer agent to facilitate the transfer

and sale of the stock. The fabricated agreement was also provided to an attorney and

Antevorta's broker-dealer. Csurgo's sale of EnviroTechnologies shares from Antevorta's

account between May 2017 and February 2018, generated proceeds of $422,367, while the

control group with Page reaped combined profits of more than $4.6 million overall.

Drone Guarder, Inc.

103. In August and September 2017, Antevorta purportedly acquired two positions of

Drone Guarder from another Blacklight accountholder, totaling 6.2 million shares. Csurgo

signed two stock purchase agreements on behalf of Antevorta purporting to show Antevorta's

payment of $20,000 for each block of shares. No payment for the shares is reflected in

Antevorta's bank or brokerage records or records of the purported seller.

104. Csurgo, through Antevorta's bank account, paid over $450,000 for a campaign

promoting Drone Guarder that ran from September 5, 2017 through March 9, 2018. Csurgo,

through Antevorta's brokerage account, sold all 6.2 million shares of Drone Guarder between

September 28, 2017 and April 3, 2018, generating proceeds of $848,514.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (All Defendants)

105. Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if

fully set forth herein.

106. During the Relevant Period, the stock of Zenosense, Envoy Group,

EnviroTechnologies, and Drone Guarder was each a security under Section 2(a)(1) of the

Securities Act [15 U.S.C. § 77b(a)(1)].

107.    By reason of the conduct described above, Shah and Clarke, directly or indirectly, in connection with the offer or sale of Zenosense securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

108.    By reason of the conduct described above, Csurgo and Antevorta, directly or indirectly, in connection with the offer or sale of Zenosense, Envoy Group, EnviroTechnologies, and Drone Guarder securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

109.    By reason of the conduct described above, Shah, Clarke, Csurgo, and Antevorta violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder (All Defendants)

110.    Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth herein.

111.    During the Relevant Period, the stock of Zenosense, Envoy Group, EnviroTechnologies, and Drone Guarder was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

112.    By reason of the conduct described above, Shah and Clarke, directly or indirectly, in connection with the purchase or sale of Zenosense securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

113.    By reason of the conduct described above, Csurgo and Antevorta, directly or indirectly, in connection with the purchase or sale of Zenosense, Envoy Group, EnviroTechnologies, and Drone Guarder securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

114.    By reason of the conduct described above, Shah, Clarke, Csurgo, and Antevorta violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a), (c)] thereunder and will continue to violate those sections unless enjoined.

### THIRD CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(All Defendants)**

115.    Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth herein.

116.    During the Relevant Period, the stock of Zenosense and Envoy Group was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

117.    By reason of the conduct described above involving Zenosense securities, Shah and Clarke, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraph 23, as to which no registration statement has been filed.

118.    By reason of the conduct described above involving Zenosense and Envoy Group securities, Csurgo and Antevorta, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or

otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraphs 22-23, as to which no registration statement has been filed.

119.     As a result, Shah, Clarke, Csurgo, and Antevorta violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)] and will continue to violate those sections unless enjoined.

### FOURTH CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
#### (Csurgo and Antevorta)

120.     Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth herein.

121.     During the Relevant Period, the stock of Zenosense and EnviroTechnologies was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

122.     By reason of the conduct described above, Csurgo and Antevorta, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

123.     By reason of the conduct described above, Csurgo and Antevorta violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)] thereunder and will continue to violate those sections unless enjoined.

37

**FIFTH CLAIM FOR RELIEF**
**OBTAINING MONEY OR PROPERTY BY MISREPRESENTATIONS IN**
**CONNECTION WITH THE OFFER OR SALE OF SECURITIES**

**Violations of Section 17(a)(2) of the Securities Act**
**(Csurgo and Antevorta)**

126.    Paragraphs 1 through 104 above are re-alleged and incorporated by reference as if fully set forth herein.

127.    During the Relevant Period, the stock of Zenosense and EnviroTechnologies was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

128.    By reason of the conduct described above, Csurgo and Antevorta, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting knowingly, recklessly, or negligently, obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129.    By reason of the conduct described above, Csurgo and Antevorta violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and will continue to violate that section unless enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

Enter a Final Judgment permanently enjoining Shah, Clarke, Csurgo, Antevorta, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§77e(a), (c) and §77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a) and (c)];

### II.

Enter a Final Judgment permanently enjoining Csurgo and Antevorta, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §240.10b-5(b)];

### III.

Enter a Final Judgment ordering Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon;

### IV.

Enter a Final Judgment imposing civil money penalties upon Defendants pursuant to

Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

## V.

Enter a Final Judgment prohibiting Shah, Clarke, and Csurgo from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; and

## VI.

Enter a Final Judgment barring Shah, Clarke, and Csurgo from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Shah, Clarke, and Csurgo from purchasing or selling securities listed on a national securities exchange for their own personal accounts

## VII.

Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

DATED: April 12, 2022.

Respectfully Submitted,

Alicia Reed (NY Bar No. 4913596)
*Martin F. Healey (Mass Bar No. 227550)
*David H. London (Mass Bar No. 638289)
*Michael Moran (Mass Bar No. 666885)

40

*Amy Gwiazda (Mass Bar No. 663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (Reed) 617-573-8931
(617) 573-8952 (Healey)
617-573-8997 (London)
617-573-8997 (Moran)
Fax: 617-573-4590
ReedA@sec.gov; HealeyM@sec.gov;
LondonD@sec.gov; MoranMi@sec.gov

*Not admitted in the S.D.N.Y.