**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

         - against -

DEAN SHAH, HENRY CLARKE, JULIUS CSURGO,
AND ANTEVORTA CAPITAL PARTNERS, LTD.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ECF Case

No. 22 Civ. 3012 (LJL)


### THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION TO INTERVENE AND FOR A COMPLETE STAY

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

Noah Solowiejczyk
Vladislav Vainberg
Jason Richman
Assistant United States Attorneys

     *- Of Counsel -*

## PRELIMINARY STATEMENT

The United States of America, by and through the United States Attorney for the Southern District of New York ("the Government"), respectfully submits this memorandum in support of its application (i) to intervene in the above-captioned case, pursuant to Rule 24 of the Federal Rules of Civil Procedure, and (ii) to stay this matter in its entirety until the conclusion of the parallel criminal case, *United States v. Julius Csurgo and Anthony Korculanic*, 22 Cr. 190 (RA) (the "Criminal Case"), with the exception that the Court's order shall not stay the pending determination of civil penalties and disgorgement owed by defendant Henry Clarke or stay the efforts by the Securities and Exchange Commission (the "SEC") to effectuate service on Dean Shah.

The Criminal Case arises from the materially identical set of facts and circumstances that underlie this civil action. As a result, a full stay (with the two isolated carve-outs) is especially appropriate because any exchange of discovery would be asymmetrical and would merely allow the defendant charged in both cases (who consents to this motion to stay) to circumvent the criminal discovery rules and improperly tailor his defenses in the Criminal Case.   In similar situations, courts in this Circuit and others have often entered a complete stay of parallel civil actions when there is a related criminal prosecution with overlapping defendants and facts, even at times over a defendant's objection. *See, e.g.*, *SEC v. Bauer, et al.*, 22 Civ. 3089 (RA) (S.D.N.Y. Oct. 11, 2022) (on consent, granting motion to intervene and stay in entirety in related civil case with carve-out to allow SEC to complete service on remaining defendants); *SEC v. Wey*, 15 Civ. 7116 (PKC) (S.D.N.Y. June 9, 2016) (after Government's motion for partial stay of discovery, and over objection of multiple defendants, implementing full stay of discovery, with the exception that SEC would produce testimony transcripts that had been produced in criminal case); *SEC v.*

*Durante et al.*, 15 Civ. 9874 (RJS) (S.D.N.Y. Mar. 23, 2016) (after Government's initial motion for partial stay of discovery, fully staying discovery and proceedings in the matter); *SEC v. Shkreli, et al.*, 15 Civ. 7175 (KAM), 2016 WL 1122029, at \*\*2-7 (E.D.N.Y. Mar. 22, 2016) (granting, over defendants' opposition, a full stay); *SEC v. Dubovoy*, 15 Civ. 6076 (D.N.J. Jan. 29, 2016); *SEC v. One or More Unknown Purchasers of Securities of Global Indus., Ltd.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738, at \*3 (S.D.N.Y. Nov. 9, 2012) (granting U.S. Attorney's Office request for full stay of discovery for six months over defendant's objection while criminal investigation was proceeding but prior to any criminal charge); *Harris v. Nassau County et al.*, 2014 U.S. Dist. LEXIS 94554 at \*10 (E.D.N.Y. 2014); *SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1070 (C.D. Cal. 2008).

For the reasons that follow, the Government respectfully requests that this Court enter an order staying this action until the completion of the Criminal Case.   The Criminal Case names two defendants: Julius Csurgo and Anthony Korculanic.   Cusrgo (and Antevorta Capital Partners, Ltd., also a defendant in the SEC matter) consent to the Government's motion to intervene and stay.   Defendant Korculanic is not named in the SEC matter.   There are two additional defendants in the SEC matter not charged in the Criminal Case:   Dean Shah, who has not yet been served by the SEC, and Henry Clarke, who appeared *pro se* and entered a consent judgment with the SEC, pending resolution of civil penalties and disgorgement.[1]  The SEC does not oppose the motion to intervene and takes no position with respect to the Government's motion to stay.

---

1 In the event Shah is served and appears, he can move to lift the stay by filing an appropriate motion with the Court.   In addition, the Government reserves the right to move to stay the open issue concerning civil penalties and disgorgement as to Clarke if the Court determines that discovery or an evidentiary hearing is necessary to resolve the issue.

## FACTUAL BACKGROUND

This case and the parallel Criminal Case arise out of largely the same underlying facts. The criminal indictment 22 Cr. 190 (RA) (the "Indictment")[2] charges Csurgo and Korculanic with securities fraud conspiracy, wire fraud conspiracy, multiple counts of securities fraud, wire fraud, and money laundering conspiracy.    The charges relate to the defendants' participation in a series of stock manipulation schemes that spanned years and involved microcap stocks traded on the over-the-counter ("OTC") market.    As the Indictment alleges, the defendants and their co-conspirators conspired to defraud the investing public by orchestrating a series of "pump-and-dump" stock manipulation schemes involving numerous stocks.    (Indictment ¶ 1).    To carry-out these stock manipulation schemes, the defendants and their co-conspirators (1) secretly amassed control of the vast majority of the stock of certain publicly traded companies; (2) manipulated the price and trading volume for these stocks, causing the share price and trading volume to become artificially inflated; and (3) selling out of their secretly-amassed positions at these inflated values at the expense of the investing public. (Indictment ¶ 17).    The Indictment references 19 different publicly traded companies whose shares were manipulated by the defendants, generating at least approximately $35 million in profits (Indictment ¶ 1-2), and provides additional particularized detail as to five of these stock tickers (Indictment ¶ 11-15) (describing Companies-1 through -5), which was just a subset of the stock tickers that the group collectively manipulated and are charged as stand-alone substantive securities fraud counts.

In connection with the conspiracy, the defendants secretly amassed control of the vast majority and, at times, substantially all of the stock of certain publicly traded companies that were

---

[2]  A copy of the Indictment is annexed hereto as Exhibit A.

listed on the OTC market in the United States. (Indictment ¶ 18).   The defendants spread the blocks of shares they controlled among multiple nominee entities established at various nominee platforms, including a firm based in Switzerland that purported to offer asset management and trustee services ("Swiss Firm-1") and a network of nominee entities based in Asia (the "Asian Nominee Platform"). (Indictment ¶ 5, 8).    The Indictment further alleges that defendants and their co-conspirators also used other nominee entities maintained at other platforms. (Indictment ¶ 10). These various nominee entities were nominally owned and controlled by various individuals (the "nominees") but, in reality, the defendants and their co-conspirators controlled the disposition of all of the shares these nominee entities held and had trading authority over the shares held by these nominee entities.   Holding the shares through this network of nominee entities allowed the defendants and their co-conspirators to conceal the fact that, in reality, they controlled the disposition of the vast majority of the shares of the relevant company.

In connection with the pump-and-dump schemes, the defendants and their co-conspirators frequently installed management at the companies whose shares they sought to manipulate. (Indictment ¶ 24).   While on paper the defendants and their co-conspirators had no connection to these companies, in reality, they exercised substantial control, which included financing the companies' operations and funding payments for attorneys in order to prepare public filings with OTC Markets Group, Inc., and the SEC in order to ensure the companies' filings were updated prior to commencing the manipulation of these companies' shares.   (*Id.*).   The defendants also caused the companies to issue press releases and announcements that were, at times, false and misleading. (Indictment ¶¶ 26-29).

The defendants are further alleged to have engaged in manipulative trading to artificially increase the trading volume and share price of the stocks.   This trading was conducted with the

objective of creating a misleading impression to the investing public of bona fide market activity in order to induce investors to ultimately purchase shares. The manipulative trading included, among other tactics, "match" trading in which the defendants' nominee entities would cause one account subject to their control to sell a certain quantity of shares while causing another account subject to their control to buy a similar quantity of shares.

In connection with the "pump," the defendants and other co-conspirators financed and coordinated promotional campaigns through which promotional materials touting the stocks of the companies were distributed to the investing public. These stock promotional materials frequently contained false and misleading claims about the issuer with the objective of inducing retail investors to purchase the shares of the issuer, thereby permitting the defendants and their co-conspirators to sell off their substantial positions for a profit. (Indictment ¶¶ 27-29).   In many instances, in order to conceal the true funding source for the stock promotions, the defendants and others transferred funds from the nominee entity that had generated stock sale proceeds to an intermediary entity, before then transferring those funds on to the company that was responsible for distribution of the stock promotion materials to the investing public.

Having artificially inflated the share prices of the relevant issuers' stock, the defendants and their co-conspirators profited from the scheme by selling the shares they controlled into the market at these artificially high prices. (Indictment ¶¶ 30-32).   The defendants reaped millions of dollars in illicit profits as a result of their manipulative activity. (*Id.*).   After the defendants and their co-conspirators sold off their shares and ceased the stock promotion campaign and their manipulative trading tactics, the share price typically quickly dropped precipitously. (*Id.*).   The defendants and their co-conspirators thereafter laundered the proceeds of their scheme with the assistance of, among others, Swiss Firm-1 the Asian Nominee Platform. (Indictment ¶ 32). This

laundering included remitting the funds in a manner designed to conceal the source of the funds or the identity of the recipients thereof, such as using fake invoices and contracts to justify wire transfers.    (*Id.*).

The Complaint filed by the SEC in this action (Dkt. No. 1) (hereinafter the "SEC Complaint")[3] relates to materially identical conduct engaged in by the same four defendants charged in the Indictment, as well as four other co-conspirators.    The SEC Complaint describes the manipulation of substantially the same issuers that are alleged in the Indictment by the same group of scheme participants.    In particular, the Indictment describes that the defendants collectively manipulated the stock of at least 19 issuers and focuses on five stocks. (Indictment ¶¶ 1, 11-15). The SEC Complaint alleges manipulation of four issuers—four of the five focused on in the Indictment. (SEC Complaint ¶¶ 22-25).    The SEC Complaint also references the same nominee entity platforms (referred to as the "Offshore Platforms" in the SEC Complaint) that are referenced in the Indictment and how this network of nominee entities was used by the defendants and their co-conspirators to obscure their identities and stock ownership. Like the Indictment, the SEC Complaint alleges that the defendants gained control of "virtually all free-trading shares of each issuer" and the SEC Complaint alleges that the defendants and their co-conspirators then deposited those shares with the various nominee entity platforms in order to conceal the true nature of their beneficial ownership, which is similarly alleged in the Indictment.    Further, as is alleged in the Indictment, the SEC Complaint claims that the defendants and their co-conspirators used stock promotion campaigns in connection with the scheme Finally, as is alleged in the Indictment, the SEC Complaint alleges the defendants and their co-conspirators, after dumping their shares,

---

[3] A copy of the SEC Complaint is annexed hereto as Exhibit B.

used "furtive means" to receive the proceeds, which included using offshore and nominee entities, falsely characterizing payments as loans or fees, and using "bogus documentation."

## PROCEDURAL BACKGROUND

On March 29, 2022, a grand jury sitting in Southern District of New York returned the Indictment, charging Csurgo and Korculanic with conspiracy to commit securities fraud (Count One), conspiracy to commit wire fraud (Count Two), securities fraud (Counts Three through Seven), wire fraud (Count Eight), and conspiracy to commit money laundering (Count Nine). The Indictment was unsealed on or about April 14, 2022.   Csurgo was subsequently arrested in Canada and Korculanic was subsequently arrested in Spain, and their extraditions are pending. The criminal case against both defendants remains pending.   The SEC filed the SEC Complaint on or about April 13, 2022.

## ARGUMENT

The Government's requests to intervene and for a complete stay of this civil action, except for a determination as to damages and disgorgement for Henry Clarke and for the SEC to effectuate service on Dean shah, should be granted.   If this case were to proceed, there would be a risk of significant interference with the Criminal Case.   A complete stay would prejudice no party to this civil action; would prevent the circumvention of important statutory limitations on criminal discovery and avoid asymmetrical discovery; and would preserve the Court's resources because many of the issues presented by the civil action will be resolved in the Criminal Case.   The two defendants in the SEC action who have been served and not yet resolved their case (Csurgo and his corporate entity, Antevorta Capital Partners, Ltd., represented by the same counsel) consent to the motion for a complete stay and the SEC takes no position with respect to the motion.   The Government is not presently seeking to stay proceedings related to the one open issue as to Clarke

7

(concerning the Court's determination of civil penalties and disgorgement) and thus the stay does not impact Clarke's SEC case at all, and Shah has not yet been served.    As such, no party to the litigation is objecting to the motion.    It is thus appropriate to grant a complete stay, with an exception to allow the Court to determine the issue of damages and disgorgement as to Clarke.

## I.    THE GOVERNMENT SHOULD BE GRANTED PERMISSION TO INTERVENE

Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, anyone may intervene as of right in an action when the applicant "claims an interest relating to the property or transaction that is the subject of the action" and the applicant "is so situated that 'disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests. . . .'"    Alternatively, Rule 24(b)(2) provides for permissive intervention when the movant "has a claim or defense that shares with the main action a common question of law or fact."    The Government respectfully submits that its application satisfies both of these provisions given the effect this civil proceeding would have on the Criminal Case and the similarity of claims and facts between the parallel proceedings.

As a general rule, courts "have allowed the government to intervene in civil actions — especially when the Government wishes to do so for the limited purpose of moving to stay discovery."    *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1009 (E.D.N.Y. 1992); *see also SEC v. Credit Bancorp.*, 297 F.3d 127, 130 (2d Cir. 2002).    The Government has a "discernible interest in intervening in order to prevent discovery in a civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988).

As an initial matter, intervention is warranted because the Government's interests in upholding the public interest in enforcement of the criminal laws cannot be protected adequately

8

by the existing parties in this civil litigation, none of whom represents the Government's interests with respect to the investigation and enforcement of federal criminal statutes. *See Bureerong v. Uvawas*, 167 F.R.D. 83 (C.D. Cal. 1996) ("[T]he Government's prosecutorial and investigative interest is not adequately protected by any of the civil parties . . . . Clearly neither the plaintiff [n]or the defendants have this identical interest."). Both of the defendants who have been served and not resolved their SEC cases consent to the Government's motion to intervene, and the SEC does not oppose.

Moreover, if this action were to proceed in advance of the Criminal Case, it would impair and impede the Government's ability to protect its interests in the enforcement of federal criminal law. This civil case and the Criminal Case arise from the same alleged pump-and-dump schemes perpetrated by many of the same defendants and co-conspirators, as described above. Holding a civil trial before a criminal trial would create the possibility that there will be two trials covering the same fraudulent acts, as the facts surrounding the defendants and their co-conspirators' perpetration of the pump-and-dump scheme are central to both this civil action and the Criminal Case. This raises the probability that witnesses will be unnecessarily burdened by having to testify twice.

In light of these circumstances, the Government respectfully submits that its application to intervene should be granted.

## II.    A NEAR-COMPLETE STAY OF THIS ACTION IS APPROPRIATE

### A.    Applicable Law

This Court has the inherent power to stay civil proceedings in the interests of justice pending the completion of a parallel criminal trial. *See Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ("[A] court may decide in its discretion to stay civil proceedings . . . when the

interests of justice seem . . . to require such action.") (internal citations and quotations omitted).
"'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'"  *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).    In evaluating whether to grant such a stay, courts in this Circuit consider:

> (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interest of the court; and (6) the public interest.

*See, e.g.*, *United States v. Tuzman*, No. 15 Civ. 7057 (AJN), Dkt. 43 at 2 (quoting *Louis Vuitton*, 676 F.3d at 99).   "Balancing these factors is a case-by-case determination, with the basic goal being to avoid prejudice."  *Volmar Distrib., Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993).   But the factors "can do no more than act as a rough guide for the district court as it exercises its discretion" and do not replace the Court's "studied judgment as to whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court." *Louis Vuitton*, 676 F.3d at 99.   The Court's "decision ultimately requires and must rest upon a particularized inquiry into the circumstances of, and the competing interests in, the case."   *Id.* (quotation marks omitted).

## B.    Discussion

Application of each of these factors here weighs in favor of the stay sought by the

Government.

### 1.    *The Extent of the Overlap*

That the criminal and civil cases involve essentially identical facts and issues weighs heavily in favor of a stay.   "The most important factor at the threshold is the degree to which the civil issues overlap with the criminal issues."   *Volmar Distrib.*, 152 F.R.D. at 39 (citing Judge Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 203 (S.D.N.Y. 1989)); *see also Parker v. Dawson*, No. 06 Civ. 6191 (JFB), 2007 WL 2462677, at *4 (E.D.N.Y. Aug. 27, 2007) (same); *United States v. One 1964 Cadillac Coupe DeVille*, 41 F.R.D. 352, 353 (S.D.N.Y. 1966) ("Where both civil and criminal proceedings arise out of the same or related transactions the government is ordinarily entitled to a stay of all discovery in the civil case until disposition of the criminal matter.").

Here, as described above, even a cursory examination of the Indictment and the SEC Complaint makes clear that the alleged wrongdoing is essentially the same.   Both the Indictment and the SEC Complaint allege manipulation of largely the same stock tickers, by an overlapping group of individuals, through materially the same means.[4]   Both the Indictment and the SEC Complaint likewise refer to trading that occurred through the same offshore trading platforms that hosted nominee entities for the co-conspirators.   In addition, both the SEC Complaint and the Indictment describe the use of materially false and misleading stock promotional campaigns in connection with the pump-and-dump schemes at issue.   In sum, these cases involve virtually

---

[4] The Indictment anonymizes the relevant companies, while the SEC Complaint identifies the companies by name. The Government proffers that the four companies focused on in the SEC Complaint are four of the five companies charged in the substantive securities fraud counts in the Indictment.

identical facts, witnesses, and issues, and allege that the same defendants engaged in substantially the same fraudulent conduct.

While the SEC Complaint names additional defendants that are not named as defendants in the Criminal Case, and the Criminal Case charges one additional defendant, this is by no means dispositive. The fact that the SEC has alleged a different swath of wrongful conduct generally has not stopped courts from staying discovery where there is "substantial overlap between the civil and criminal proceedings." *Tuzman*, No. 15 Civ. 7057 (AJN), ECF No. 43, at 2-3 (ordering a partial stay of discovery, over opposition, notwithstanding that some fraudulent conduct charged in the civil case was not referenced in the criminal indictment). That is not surprising given that, whether the SEC case is broader than the Criminal Case or vice-versa, the issue relevant to whether a stay is appropriate is the same: whether it is likely that substantially the same set of facts would have to be proven twice in two different proceedings, draining resources from the courts and from the Government, and inconveniencing witnesses. *See, e.g.*, *Shkreli*, 2016 WL 1122029, at *4; *Tuzman*, No. 15 Civ. 7057 (AJN), ECF No. 43, at 3. Here, that is unambiguously the case.

In sum, this factor weighs heavily in favor of a stay. *See, e.g.*, *Shkreli*, 2016 WL 1122029, at *4; *Tuzman,* 15 Civ. 7057 (AJN), at 3.

### 2.    *The Status of the Criminal Case*

The return of an indictment in the Criminal Case is also a factor that weighs in favor of a stay. "[T]he strongest argument for granting a stay is where a party is under criminal indictment." *Shkreli*, 2016 WL 1122029, at *5 (quotation and citation omitted). Indeed, "[t]he weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment." *In re Par Pharm, Inc. Sec. Litig.*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990); *see also Trustees of Plumbers and Pipefitters Nat'l Pension Fund, et al. v.*

*Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) ("A stay of a civil case is most appropriate when a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved."). Thus, this factor also militates strongly in favor of a stay.

The fact that three of the defendants in the Civil Case – Clarke, Shah, and Antevorta Capital Partners Ltd. – are not defendants in the Criminal Case does not undercut this rationale. In the interest of protecting the integrity of criminal proceedings, courts in this district have granted discovery stays even where no criminal charges have yet been brought. For example, in *SEC v. Beacon Hill Asset Management LLC*, Judge Kaplan granted a discovery stay pending the completion of a grand jury investigation. No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *2 (S.D.N.Y. Feb. 27, 2003). Similarly, in *United States v. Downe*, Judge Leisure stayed the deposition of a cooperating witness, even though no defendants had yet been indicted. *Downe*, No. 92 Civ. 4092 (PKL), 1993 WL 22126, at *13 (S.D.N.Y. Jan. 26, 1993); *see also SEC v. One or More Unknown Purchasers of Securities of Glob. Industries, Ltd.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738, at *3 (S.D.N.Y. Nov. 9, 2012) (noting that, "where the government is requesting a stay that is opposed by the defendant, . . . 'courts have granted stays of discovery to protect the integrity of pending criminal investigations, even when an indictment has not yet been returned" (quoting *Downe*)). This is particularly the case here, where (a) Clarke has resolved his case,

pending resolution of an isolated issue that is otherwise carved-out from the requested stay; (b) Shah has not yet been served; and (c) Antevorta Capital Partners Ltd. consents to the stay.

### 3.    *The Potential Prejudice to the Parties*

No prejudice will result from the stay requested by the Government.   The SEC has indicated that it takes no position as to the Government's motion to stay.   The SEC will not be adversely impacted by a stay, as such a stay will allow the SEC to conserve its resources (as well as the resources of the Court) by avoiding needless duplicative litigation of many of the issues presented by the civil action that may be resolved in the criminal case.   Further, the contemplated stay carves out two issues at interest to the SEC—the resolution of civil penalties and disgorgement for Clarke, and service of Shah.   At a minimum, therefore, there can be no argument that there would be prejudice to the plaintiff by staying this action. *See Shkreli*, 2016 WL 1122029, at *5 (citing cases).

With respect to the defendant who is also a defendant in the Criminal Case, granting a stay of the civil case to permit the Criminal Case to proceed to its conclusion would actually inure to his benefit, since granting a stay of the civil case would, for now, obviate forcing him to make the choice between being prejudiced in the civil case by the assertion of their Fifth Amendment rights or being prejudiced in the Criminal Case if they waived those rights.   A complete stay will also allow the defendant, like the SEC, to conserve resources and avoid needless duplicative litigation of materially identical issues in two separate proceedings.   And, again, Shah has not yet been served (but, if he is, can file a motion seeking to lift the stay) and Clarke's case will remain unimpacted by the proposed stay, as he has come to agreement on an Judgment with only a limited issue (also carved out of the proposed stay) pending.   Finally, Antevorta Capital Partner's Ltd., an entity owned and operated by Csurgo, consents to the stay, and will, like Csurgo, benefit from

14

the resources it will not need to exert in parallel litigation.

In sum, no party will suffer any unfair prejudice from a complete stay and the fact that all defendants who have been served consent to the motion further weighs in favor of granting the motion.

### 4.    *The Interests of the Court*

Considerations of judicial economy also weigh in favor of granting a stay.   Issues common to both cases can be resolved in the criminal proceeding, thereby simplifying the civil action.   *Cf. SEC v. Contorinis*, No. 09 Civ. 1043 (RJS), 2012 WL 512626, at *2 (S.D.N.Y. Feb. 3, 2012) ("Courts in this district have consistently found that a defendant convicted of securities fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a subsequent civil proceeding."); *Global Indus*., 2012 WL 5505738, at *4 ("[T]he Civil Case is likely to benefit to some extent from the Criminal Case no matter its outcome."); *LaBianca*, 801 F. Supp. at 1010-11 (recognizing judicial economy as a factor to be considered).   Because the Criminal Case's outcome will likely affect the conduct, scope, and result of the civil proceeding, thereby streamlining issues in this matter and avoiding duplication of effort and judicial resources, this factor favors the Government's application for a complete stay.

### 5.    *The Public Interest*

Finally, the Government and the public have an important interest in ensuring that civil discovery is not used to circumvent the well-founded restrictions that pertain to criminal discovery — restrictions that, *inter alia*, preserve the truth-seeking functions of the criminal process by restraining the ability of criminal defendants to tailor testimony, suborn perjury, manufacture evidence or intimidate witnesses.   *See United States v. Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (noting that the Jencks Act, 18 U.S.C. § 3500, "represents a legislative determination that

access to a witness' statements could be useful in impeaching a witness but was not intended to be

utilized in preparation for trial"); *United States v. McCarthy*, 292 F. Supp. 937, 942 (2d Cir. 1968)

("The claimed need to see such statements in advance in order to prepare to rebut them is little

more than open notice of an intention to tailor testimony to fit the statement."); *Nicholas*, 569 F.

Supp. 2d at 1070 (the criminal rules were "purposefully limited so as to prevent perjury and

manufactured evidence, to protect potential witnesses from harassment and intimidation, and to

level the playing field between the government and the defendant, who would be shielded from

certain discovery by the Fifth Amendment").

In *Tuzman*, Judge Nathan outlined three principal Government interests justifying a stay of

discovery of civil proceedings while parallel criminal proceedings are pending:

> First, broad disclosure of the essentials of the prosecution's case
> may lead to perjury and manufactured evidence. Second, revelation
> of the identity of prospective witnesses may create the opportunity
> for intimidation. Third, criminal defendants may unfairly surprise
> the prosecution at trial with information developed through [civil]
> discovery, while the self-incrimination privilege would effectively
> block any attempts by the Government to discover relevant evidence
> from the defendants.

*Tuzman*, No. 15 Civ. 7057 (AJN), at 3-4 (internal citations and quotations omitted).    Based on

these concerns, judges in this District have frequently granted Government requests to limit

discovery in a parallel civil action in order to prevent the civil discovery rules from being subverted

into a device for improperly obtaining discovery in the criminal proceeding.    *See, e.g.*, *Tuzman*,

No. 15 Civ. 7057 (AJN) (granting stay sought by Government); *SEC v. Beacon Hill Asset

Management LLC*, No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *1 (S.D.N.Y. Feb. 27, 2003) (in

granting government's motion to stay, court noted: "The principal concern with respect to

prejudicing the government's criminal investigation is that its targets might abuse civil discovery

to circumvent limitations on discovery in criminal cases."); *Phillip Morris Inc. v. Heinrich*, No. 95 Civ. 328 (LMM), 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (granting stay motion because if "civil discovery is not stayed, the criminal investigation will be prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules."); *Bd. of Governors of the Federal Reserve System* v. *Pharaon*, 140 F.R.D. 634, 639 (S.D.N.Y. 1991) ("'A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal trial.'") (quoting *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1952)).

Indeed, the rationale underlying a stay is even stronger in an indicted matter, given that a defendant in a charged criminal case will likely invoke his Fifth Amendment rights in the civil case and not participate in the very discovery process he seeks to use affirmatively.  *See, e.g.*, *SEC v. Chakrapani*, 2010 WL 2605819 (S.D.N.Y. June 29, 2010) (inviting the Government to renew its motion to stay discovery if the defendant intends to invoke the Fifth Amendment if noticed for a deposition); *Nicholas*, 569 F. Supp. 2d at 1070 (noting when granting full stay that "[t]he specter of parties and witnesses invoking their Fifth Amendment rights would render discovery largely one-sided; the SEC would produce scores of documents and witness testimony only to be precluded from gathering reciprocal discovery from the defendants").

A denial of the Government's requested stay would therefore result in asymmetrical discovery, pursuant to which the defendants would be able to obtain statements from relevant witnesses through depositions and use other discovery mechanisms such as requests for admission and interrogatories to obtain information from the SEC, while the SEC would be unable to use any of these discovery mechanisms to obtain information from the defendants because of their

17

assertion of his Fifth Amendment rights.   Such asymmetry is both unfair and a circumvention of the criminal discovery rules that govern when criminal defendants are entitled to obtain prior statements of the Government's trial witnesses.   *See* 18 U.S.C. § 3500(b) (prior statements of Government witnesses must be made available after the witnesses have testified on direct examination).

Therefore, in order to avoid circumvention of the criminal discovery restrictions, including the provisions that are designed to prevent defendants from tailoring their testimony and obtaining asymmetrical discovery, and because the defendants will not in any way be prejudiced in preparing and defending themselves, this factor weighs in favor of the Government's application.

## CONCLUSION

For these reasons, the Government respectfully requests that its application to intervene and for a complete stay of this matter be granted. A proposed stay order is annexed hereto as Exhibit C.

Dated:  New York, New York
         December 6, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/ Jason Richman
        Noah Solowiejczyk
        Vladislav Vainberg
        Jason Richman
        Assistant United States Attorneys
        One Saint Andrew's Plaza
        New York, New York 10007
        Telephone: (212) 637-2473/1029/2589

18