UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/28/2022
```

------------------------------------------------------------------X
                                       :

SECURITIES AND EXCHANGE COMMISSION,  :

                Plaintiff,  :

                    :        22-cv-3012 (LJL)

      -v-  :

                    :    MEMORANDUM &
DEAN SHAH, HENRY CLARKE, JULIUS CSURGO,  :       ORDER
and ANTEVORTA CAPITAL PARTNERS, LTD.,  :

                    :
                Defendants.  :

                    :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      The United States Securities and Exchange Commission ("SEC") moves for civil

penalties and disgorgement against Defendant Henry Clarke ("Defendant" or "Clarke").  Dkt.

No. 36.

## BACKGROUND

      The allegations of the complaint, Dkt. No. 7 ("Complaint"), are accepted and deemed

true by the Court for purposes of this motion.  Dkt. No. 33 ¶ VIII.  The Court summarizes only

those allegations that are material to the Court's decision.

      Clarke was a participant in a scheme to defraud investors in a thinly traded micro-cap

company, Zenosense, Inc. ("Zenosense"), from 2013 through at least 2018.  *See* Dkt. No. 7 ¶¶ 2,

5–7, 79.  He did so with his co-defendants Dean Shah ("Shah"), Julius Csurgo ("Csurgo"), and

Antevorta Capital Partners, Ltd. ("Antevorta").  *Id.* ¶¶ 5–6.  The Complaint lays out how the

scheme operated.  Clarke and Shah concealed their ownership of a controlling position in

Zenosense shares by spreading the stock they owned in a number of different nominee accounts.

*Id.* ¶¶ 5, 49.  Having concealed that they controlled the stock, they then promoted it through

campaigns that they and their co-conspirators secretly funded.  *See id.* ¶¶ 49–62.  They then dumped the stock on unsuspecting investors, causing losses to the investing public and realizing unjustified and illegal gains.  *See id.*

Clarke and Shah were clients of the Sharp Group, a Vancouver-based organization run by an individual named Frederick Sharp, which was in the business of facilitating illegal stock sales in the public securities markets.  *Id.* ¶ 33.  The Sharp Group concealed the identities of its clients, including Clarke and Shah, by offering an array of services, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons and providing and administering an encrypted communications network.  *Id.*

By April 2013, Clarke and Shah controlled all 30 million shares of common stock of Zenosense's predecessor, a company named Braeden Valley Mines, Inc.  *Id.* ¶¶ 37–38.  The two then took steps to create the false appearance that Zenosense's shares were beneficially owned by independent shareholders, rather than by Clarke and Shah, by holding the stock in the names of several offshore nominee entities.  *Id.* ¶ 49.  Beginning in September 2013, the Sharp Group deposited the shares accumulated by Clarke and Shah into various offshore brokerage accounts in the names of nominee entities.  *Id.*  Each account held stock in blocks of less than five percent in order to avoid having to disclose their beneficial ownership of the stock in regulatory filings and to avoid suspicion by transfer agents, broker-dealers, and other market participants who exercised special scrutiny over sellers holding five percent or more of a company's stock.  *Id.* ¶¶ 49–50.

Clarke's communications with Sharp and his co-defendants reflect some consciousness of wrongdoing.  When Clarke wrote to Sharp in October 2013 to ask whether new share certificates resulting from a share dividend should be mailed directly to the nominee shareholders, Sharp

responded "Nooo.  Never" and instructed that the share certificates should be sent through a lawyer because "if the sec investigates this company," "the sec will not bother the lawyer."  *Id.* ¶ 41.  Clarke wrote to Sharp that he was working on the transaction with a lawyer who was "quite straight which is the concern and I don't want to request something that could cause problems."  *Id.*  On December 8, 2013, Clarke wrote to Shah about the timing of the cancellation of shares that were held by the previous directors of the company.  *Id.* ¶¶ 42–44.  The cancellation of shares decreased the total number of shares outstanding, and Clarke expressed concern about "running the risk" of carrying positions in excess of five percent as a result.  *Id.* ¶ 44.

In 2013, while actively concealing their control over Zenosense, Clarke and Shah began to orchestrate a promotional campaign to pump Zenosense's stock price.  *Id.* ¶ 51.  To conceal their involvement in the campaign, they used the Sharp Group to incorporate a Belize entity, Rolling Media Solutions, Inc. ("Rolling Media"), to act as an intermediary and to pay for the promotions, so that Rolling Media—and not Clarke and Shah—would be listed as the paying party in disclaimer language on written promotions.  *Id.*  In 2014 and 2015, Clarke and Shah actively engaged with promoters, including by reviewing and editing the content of promotional materials.  *Id.* ¶ 57.  The two took other steps to conceal their involvement with the promotion of Zenosense stock.  On January 25, 2014, Shah wrote to Clarke proposing a "boiler room," or high-pressure sales tactics in cold calls to potential investors, to "start flogging this stuff."  *Id.* ¶ 53.  In April 2014, Clarke wrote to Shah about taking steps to mask ownership of promotional websites: "someone has to set up a google account—I am not going to do it from my home ip—if you have an internet shop anywhere near you that would be the best bet and do it using [the name and address of Rolling Media's purported beneficial owner] if it will allow you without a

phone number—I can do it from a shop tomorrow at some point although mexico would be better. . . . If they want a phone number just google a flower shop in belize [where Rolling Media was incorporated] and use that." *Id.* ¶ 52.

Then, Clarke and Shah began to sell shares during the promotions that they orchestrated. *Id.* ¶ 60. For example, on June 25, 2015, Clarke wrote to Wintercap SA ("Wintercap," formerly known as Silverton SA), which controlled several of the Sharp Group-administered brokerage accounts, asking it to offer to sell Zenosense shares at $0.95 per share and to sell 20,000 shares "at that level for starters." *Id.* In 2014 and 2015, Clarke and Shah, through nominee entity accounts administered by the Sharp Group, sold approximately 6.6 million shares of Zenosense during a promotional campaign for total proceeds of approximately $2.3 million. *Id.* ¶ 61.

In July 2015, Shah and Clarke stopped selling Zenosense through the Sharp Group and established a direct relationship with Wintercap and its principal, Roger Knox ("Knox"). *Id.* ¶ 63. In October 2015, over two million shares of Zenosense stock were transferred from Sharp Group-administered accounts to an Agron Capital SA ("Agron") account, whose beneficial owner was listed as Shah, at Wintercap. *Id.* Beginning in May 2016, funds were transferred from the Agron account, through the account of another Wintercap client, Richmont Capital AG, to a Canadian lawyer, and ultimately to a New York law firm acting as counsel for Zenosense for the benefit of a Panamanian entity named Valley Heights, Inc. ("Valley Heights"), which was controlled by Clarke and Shah. *Id.* ¶¶ 64–65. Valley Heights then purchased over 61 million restricted shares of Zenosense issued on June 8, 2016. *Id.* Clarke and Shah used their control of Zenosense to cause the company to approve a 1-for-7 reverse split of its stock, reducing the shares held by existing investors and concentrating their control of the company. *Id.* ¶ 65. Shah and Clarke then partnered with Csurgo and Antevorta to create a control group to pump and

4

dump Zenosense shares, including through a promotional campaign that Csurgo sponsored. *Id.* ¶ 66. The pump-and-dump scheme included the deposit of unrestricted shares in Antevorta's accounts held at Wintercap and Blacklight SA, another entity incorporated to help conceal ownership of securities, and the conversion by Clarke and Shah of previously issued Zenosense debt into additional shares of Zenosense common stock. *Id.* ¶¶ 36, 68–72, 75. During one promotional campaign, between February 13, 2017 and April 10, 2017, Shah, Clarke, Csurgo and others with whom they coordinated sold over 6.3 million Zenosense shares, generating proceeds of approximately $7.9 million. *Id.* ¶¶ 76–77. Shah, Clarke, Csurgo, and Antevorta failed to register their stock sales pursuant to Section 5 of the Securities Act of 1933 ("Securities Act"). *Id.* ¶ 78.

By June 2017, Clarke and Shah were no longer partnering with Csurgo and Antevorta to pump and dump Zenosense shares. *Id.* ¶ 80. Both continued their fraud and needed a new entity to hold positions below five percent to conceal their ongoing control. *Id.* On July 10, 2017, Wintercap incorporated a new entity, Nerima Capital SA ("Nerima") in the Marshall Islands, to hold Zenosense shares belonging to Clarke and Shah, while remaining below the five-percent threshold. *Id.* ¶ 81. Although Clarke and Shah provided Wintercap with the name and passport of a person identified as the beneficial owner of Nerima, Clarke and Shah maintained trading authority over the Nerima account. *Id.* Wintercap, acting at the direction of Clarke and Shah, then arranged the paperwork to transfer Zenosense shares from existing purported shareholders into Nerima's name. *Id.* ¶ 83. Shah continued to direct promotional activities regarding Zenosense. *Id.* ¶ 84. Clarke and Shah directed Wintercap to sell shares held by the Agron and Nerima accounts during the promotions that they continued to orchestrate. *Id.* ¶ 85.

Between June 2017 and September 2018, Clarke and Shah sold 8,962,059 shares of Zenosense, generating another $3.2 million in trading proceeds, without registering the stock sales pursuant to Section 5 of the Securities Act. *Id.* ¶¶ 86–87.

The Complaint alleges that Clarke violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act (15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1) and (3)) and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a) and (c)). *Id.* ¶ 12.

On July 21, 2022, the Court entered a partial consent judgment (Judgment), permanently restraining and enjoining Clarke from violating (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a) and (c); (2) Sections 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (3); (3) Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c); and (4) Section 21(d)(5) of the Exchange Act. *See* Dkt. No. 33 ¶¶ I–IV.  The Court also enjoined Clarke from participating in an offering of penny stock or inducing or attempting to induce the purchase or sale of any penny stock. *Id.* ¶ V.  The judgment also ordered Clarke to pay disgorgement and, if ordered by the Court, a civil penalty. *Id.* ¶ VI.  It stated:

> IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay disgorgement of ill-gotten gains and prejudgment interest thereon; that the amounts of the disgorgement and civil penalty shall be determined by the Court upon motion of the Commission; and that prejudgment interest shall be calculated from April 9, 2014, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax.

*Id.*  The partial judgment provided that in connection with the SEC's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion, Clarke would be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint, that he could not challenge the validity of the Judgment or the consent that was made part of the

Judgment ("Consent"), that the allegations of the Complaint would be accepted as true and deemed true by the Court solely for the purposes of the motion, and that the Court could determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. *Id.*

The SEC submitted a motion for civil penalties and disgorgement against Clarke, and a supporting memorandum of law and supplemental declaration, on October 26, 2022. Dkt. Nos. 36, 37. Clarke responded to the SEC's motion on November 22, 2022, Dkt. No. 40, to which the SEC replied on December 1, 2022, Dkt. No. 41.[1] On December 13, 2022, the Court issued an order indicating that it was prepared to decide the motion without argument or a hearing and directing the parties to submit a letter by December 23, 2022 if such a hearing was desired. Dkt. No. 49. Neither party submitted a letter by the December 23, 2022 deadline.

## DISCUSSION

The SEC seeks entry of final judgment against Clarke that incorporates the terms of the prior partial judgment, imposes disgorgement of $45,234 plus prejudgment interest of $9,177, and imposes "an appropriate civil penalty." Dkt. No. 37 at 1. The Court first addresses disgorgement and then addresses the civil penalty.

---

[1] On December 6, 2022, the United States Attorney's Office for the Southern District of New York moved to intervene and to partially stay this matter until the conclusion of the criminal proceedings against Csurgo and a non-party defendant. *See* Dkt. Nos. 43, 44. The Court granted the motion and partially stayed proceedings in this matter. Dkt. No. 48. However, the partial stay does not apply to the determination of civil penalties and disgorgement owed by Clarke. *Id.*

## I.  Disgorgement

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The Exchange Act provides that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement."  15 U.S.C. § 78u.  Indeed, "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains." *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).  Under the Supreme Court's decision in *Liu v. SEC*, "disgorgement awards issued as 'equitable relief' [are limited] to a 'wrongdoer's net profits.'"  *SEC v. de Maison*, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021) (summary order) (quoting *Liu*, 140 S. Ct. at 1940).  However, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation,' and 'any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  *Id.* (quoting *SEC v. Razmilovic*, 783 F.3d 14, 31 (2d Cir. 2013)); *see SEC v. Patel,* 61 F.3d 137, 139 (2d Cir. 1995) (same); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989) (same); *SEC v. Kapur*, 2012 WL 5964389, at *2 (S.D.N.Y. Nov. 29, 2012) (same); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (same).  "'Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant,' who is 'obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation.'"  *de Maison*, 2021 WL 5936385, at *2 (quoting *Razmilovic*, 738 F.3d at 31–32); *see SEC v. Genovese*, 553 F. Supp. 3d 24, 47 (S.D.N.Y. 2021), *appeal dismissed*, 2022 WL 199951 (2d Cir. Jan. 5, 2022); *SEC v. Cope*, 2021 WL 6530888, at *2 (S.D.N.Y. Feb. 19, 2021).  "[S]pecific tracing [is] unnecessary in ordering disgorgement for

securities fraud." *de Maison*, 2021 WL 5936385, at *2 (quoting *SEC v. Contorinis*, 743 F.3d 296, 303 n.3 (2d Cir. 2014)).

The SEC has based its claim for disgorgement on the allegations of the Complaint, which must be taken as true by the Court, *see* Dkt. No. 33 ¶ VI, and upon the supplemental declaration of SEC Senior Enforcement Accountant Trevor T. Donelan ("Donelan," and the supplemental declaration, the "Donelan Declaration"), Dkt. No. 36-2.[2]  Donelan calculates the $45,234 in net proceeds to Clarke that the SEC seeks as disgorgement in the following way:  First, $23,484 (using the October 7, 2022 exchange rate) was paid to Clarke in three equal payments of €8,000 between February 15, 2018 and April 4, 2018 from an entity named TSW Services, which Donelan states was an entity controlled by Knox.  Dkt. No. 36-2 ¶ 11a.  The payments were made from proceeds of the sale of Zenosense stock derived from Clarke and Shah's Nerima nominee account at Wintercap and were wired from the TSW Services account to Clarke's bank account at Banco Santander in Spain.  *Id.*  Although the wire transfer records reflect that the payments were for a "Clarke consultancy contract," there is no record that Clarke ever provided any bona fide consulting services to TSW Services.  *Id.*  Second, an additional $21,750 was paid to Clarke from 2016 to 2018 from Zenosense's law firm's trust account, which was funded exclusively with payments from Wintercap.  *Id.* ¶ 11b.

The SEC has met its burden of establishing a reasonable approximation of the profits causally related to the fraud.  The Complaint alleges that Nerima was formed to hold Zenosense

---

[2] Donelan is a Certified Public Accountant in the Commonwealth of Massachusetts, and a Certified Fraud Examiner by the Association of Certified Fraud Examiners.  Dkt. No. 36 ¶ 3.  He is also certified in Financial Forensics by the American Institute of Certified Public Accountants. *Id.*  He has been a Senior Enforcement Accountant with the SEC since September 2014 and before that was a managing director in the forensic accounting and complex business litigation unit at StoneTurn Group, LLP for over seven years.  *Id.* ¶¶ 1–2.

shares belonging to Shah and Clarke, while remaining below the five-percent reporting threshold. Dkt. No. 7 ¶ 81; *see also id.* ¶ 7 (Nerima was "another fictional nominal entity [formed by Shah and Clark] to hold Zenosense shares and disguise their controlling interest"). It further alleges that Clarke and Shah maintained trading authority over the Nerima account, *id.*, that the two deposited the Zenosense shares into the Nerima account, *id.* ¶ 86, and that Clarke and Shah directed Wintercap to sell Zenosense shares held by the Nerima account to unsuspecting investors between June 2017 and September 2018 during the promotions that they orchestrated, *id.* ¶¶ 8, 85–86. Finally, it alleges that Clarke and Shah failed to register the stock sales pursuant to Section 5 of the Securities Act as they were required to do as affiliates of Zenosense. *Id.* ¶ 87. The allegations thus establish that Clarke violated Section 5 of the Securities Act, and because the shares were sold during the promotion, Section 10(b) of the Exchange Act, by directing the sale of Zenosense shares from the Nerima account without registering the shares for sale. The Donelan Declaration also establishes that the payments to Clarke between February and April 2018 from funds derived from the Nerima account constituted profits causally related to that fraud. Dkt. No. 36-2 ¶ 11a.

The SEC has also met its burden of establishing that the payments totaling $21,750 from Zenosense's law firm's trust account, which were funded exclusively with payments from Wintercap between 2016 and 2018, were also related to the fraud. The Complaint alleges that Clarke and Shah controlled Zenosense, Dkt. No. 7 ¶¶ 5, 47, including by taking steps to arrange for a new auditor and a new transfer agent for the company, *id.* ¶ 48. The Complaint further alleges that Clarke and his co-defendants worked together to deposit purportedly unrestricted stock with Wintercap, *id.* ¶¶ 68, 81, 83, and that Clarke and Shah directed Wintercap to sell their Zenosense shares during the promotions that they orchestrated, *id.* ¶¶ 60, 85. The Complaint

also alleges that Clarke and Shah were affiliates of Zenosense and their stock sales, including

those made through Wintercap, were subject to registration pursuant to Section 5 of the

Securities Act, but, in violation of the Securities Act, Clarke and Shah did not register the shares

that they sold, *id.* ¶¶ 62, 78, 87.  Finally, the SEC has put forward evidence that the payments to

Clarke were funded by Wintercap.  *See* Dkt. No. 36-2 ¶ 11b.  This evidence is sufficient to

establish that the payments made to Clarke from Zenosense's law firm's trust account are

causally related to the fraud.

Clarke does not offer evidence to rebut the presumption in the SEC's favor.  He does not

dispute that he received the payments totaling $23,484 from TSW Services or that the funds from

the Nerima account were funded from the sale of Zenosense shares that should have been

registered but were not.  Dkt. No. 40 at 1–2.[3]  Rather, he claims these proceeds were from a

consulting agreement he entered into with TSW Services, but does not offer evidence that he

provided any consulting services.  *Id.*  He also acknowledges that $9,150 of the $21,750 from

Zenosense's law firm's trust account paid between March 1, 2017 and May 31, 2017 were

proceeds derived from the sale of Zenosense stock "by others."  *Id.* at 3.  With respect to the

payments from the law firm trust account from May 2016 to February 2017, Clarke asserts that

any promotion of Zenosense stock ceased between July 2015 and February 2017 and that the

promotional and administrative costs of setting up the scheme exceeded the amount generated by

stock sales up to that point, suggesting that the payments to Clarke could not have represented

profits from stock sales because there were no such profits.  *Id.* at 2.  But this argument lacks

merit for several reasons.  First, Clarke was charged with, and does not dispute his liability for,

[3] Clarke does assert that Zenosense received funds from private placement and loan financings. Dkt. No. 40 at 2.  This assertion is not responsive to the evidence that the funds in the trust fund account were from Wintercap.

the sale from Wintercap of shares that should have been registered under Section 5 of the Securities Act.  Thus, whether there was a promotional campaign ongoing at the time of the sales is irrelevant to the question whether the funds in the accounts at Wintercap—that were then paid to Zenosense's law firm's trust account—represented the proceeds of the securities fraud charged in the complaint.  Second, courts need only "deduct legitimate expenses before ordering disgorgement."  *Liu*, 140 S. Ct. at 1950.  The "promotional costs and administrative costs to set up the scheme," Dkt. No. 40 at 2, are not legitimate and need not be deducted.  If Clarke used the proceeds of the sale of Zenosense shares to fund the ongoing operation of the fraudulent scheme, those proceeds would constitute "wrongful gains 'under another name.'"  *Liu*, 140 S. Ct. at 1950 (quoting *Rubber Co. v. Goodyear*, 9 Wall. 788, 803 (1870); *see SEC v. CKB168 Holdings, Ltd.*, 2022 WL 3347253, at *5 (E.D.N.Y. Aug. 12, 2022) (declining to deduct expenses where defendant failed to show that they were legitimate).  Finally, "the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation."  *de Maison*, 2021 WL 5936385, at *2 (internal quotation marks and citation omitted).  Taking these precepts into account, the amount requested by the SEC constitutes a reasonable approximation of Clarke's ill-gotten gains.

The SEC also seeks prejudgment interest on the award of disgorgement.  "Since the primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws, it is within the discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits."  *Razmilovic*, 738 F.3d at 36 (internal citations and quotations omitted).  "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result

of illegal activity." *Haligiannis*, 470 F. Supp. 2d at 385 (internal quotation marks omitted) (quoting *SEC v. Moran,* 944 F. Supp. 286, 295 (S.D.N.Y. 1996)). "[T]he Second Circuit has approved the calculation of prejudgment interest at the IRS underpayment rate, which 'reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its [illegal conduct].'" *SEC. v. Tavella*, 77 F. Supp. 3d 353, 360 (S.D.N.Y. 2015) (quoting *First Jersey,* 101 F.3d at 1476).

The SEC's application for prejudgment interest is well supported. The SEC calculates prejudgment interest of $9,177 through October 1, 2022 on the disgorgement of $45,234. *Id.* ¶ 12. Donelan arrives at this figure by assuming that any payment received in a calendar year was received on December 31 of that year and then calculating prejudgment interest from December 31st of each year through October 1, 2022, using the interest rate used by the Internal Revenue Service for unpaid balances, which changes quarterly. *Id.* The Court thus will order prejudgment interest of $9,177.[4]

## II.    Civil Penalty

The Securities Act and Exchange Act authorize the SEC to seek the imposition of civil money penalties. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Civil penalties serve "the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (internal quotation marks omitted) (quoting *Moran,* 944 F. Supp. at 296). Courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of the violation, or

---

[4] The Court notes that although funds belonging to Csurgo and Antevorta have been frozen, Dkt. Nos. 10, 19, 22, no such order was entered as to Clarke and he does not allege that the amount of interest should be reduced on account of any restraint of his ability to enjoy the ill-gotten gains. *See Razmilovic*, 738 F.3d at 36–38 (holding that prejudgment interest should not be awarded for period of time during which assets are frozen at the government's behest).

(ii) a specified amount per violation, depending on whether the violation falls in the "first-tier," "second tier," or "third-tier."  15 U.S.C. § 77t(d)(2); 15 U.S.C. §78u(d)(3)(B).  A "first-tier" penalty may be imposed for any violation of the Exchange Act or the Securities Act.  15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i).  A "second-tier" penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii).  And a third-tier penalty may be imposed when, in addition to meeting the requirements of a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).  *See SEC v. Madsen*, 2018 WL 5023945, at *3 (S.D.N.Y. Oct. 17, 2018); *Kapur*, 2012 WL 5964389, at *6–7.

Although the statutory "tier" establishes the maximum penalty, "the actual amount of the penalty [is] left up to the discretion of the district court."  *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005).  "In assessing the appropriate civil monetary penalty, courts have considered the following factors: '(1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation.'"  *Genovese*, 553 F. Supp. 3d at 46 (quoting *SEC v. Zwick*, 2007 WL 831812, at *26 (S.D.N.Y. Mar. 16, 2007), *aff'd*, 317 F. App'x 34 (2d Cir. 2008)).  Finally, because the statutory penalty provisions authorize civil penalties "for each violation," 15 U.S.C. § 78u(d)(3)(B)(i), but do not define the term "violation," courts exercise wide discretion in calculating the number of "violations," and thus the number of penalties to be imposed in a given

case.  *See In re Reserve Fund Secs. & Derivative Litig.*, 2013 WL 5432334, at *20 (S.D.N.Y.

Sept. 30, 2013) (describing varying methodologies courts have used to calculate the number of

"violations"); *see also Madsen*, 2018 WL 5023945, at *5.

The SEC argues that a civil penalty is appropriate and that Clarke participated in a fraud

that "directly or indirectly resulted in substantial losses or created a significant risk of substantial

losses."  Dkt. No. 37 at 9.  The SEC does not identify a specific penalty amount that it believes to

be appropriate.  *See id.* at 8–11.  The SEC argues that Clarke's conduct was egregious,

demonstrated a high degree of scienter, and was not an isolated event but rather involved a series

of actions taken to facilitate and conceal a securities fraud scheme.  *Id.* at 9–10.  At the same

time, however, the SEC argues that Clarke's honesty with authorities "merits consideration in

Clarke's favor in light of his affirmatively reaching out to [the SEC] to accept service of the

Complaint and Summons by email, and then entering into a consent agreement" and that

Clarke's limited ability to pay permits the Court discretion to lower the penalty amount that

would otherwise be appropriate.  *Id.* at 10.

Clarke acknowledges that his "conduct may deserve an appropriate civil penalty" but

asks that the Court impose a first-tier penalty if it decides that one is warranted.  Dkt. No. 40 at

4–5.  Clarke argues that several factors favor a lower civil penalty.  First, he proactively

contacted SEC counsel to arrange and accept prompt service of the Complaint as soon as he

became aware of it, accepted service by email, and voluntarily entered into a consent

agreement—instead of forcing the SEC to go through the time and incur the expense of seeking

to serve him outside the United States.  *Id.* at 4.  Second, he has "admitted to the instances where

[he] believe[s], in hindsight, that [he] ha[s] been in contravention of certain rules and laws."  *Id.*

Third, he asks the Court to take into consideration the relatively small sums he earned from the

fraudulent conduct and states "categorically" that a penalty is not needed for purposes of specific deterrence as he has already been "wholly and fundamentally deterred from ever repeating [his] conduct for many reasons, quite aside from the prospect of financial penalties." *Id.* at 5. Finally, he argues that his ability to pay is a mitigating factor; his net worth is negative approximately $50,000, he lives "month to month, by casual self-employed manual labor," he has no formal work experience that he might use to apply for more gainful employment, he has three children to support, he has been unable to pay his rent, taxes, and household utility bills, and he has been forced to borrow money from family members. *Id.* at 3–4.

The conduct here involved fraud, deceit, manipulation, and at least reckless disregard of regulatory requirements, all which would permit a second-tier penalty of $105,591. *See* 17 C.F.R. § 201.1001(b). Clarke's conduct was not isolated and there is evidence that he acted at least with reckless disregard; he arranged for a new auditor and transfer agent for Zenosense, Dkt. No. 7 ¶ 48, and on at least one occasion, acknowledged that his involvement in the scheme ran afoul of legal requirements, *see id.* ¶ 41. Whether Clarke's conduct would permit a third-tier penalty is a closer question. There is a division of authority in this District regarding the evidence necessary for the Court to conclude that a securities law violation has "resulted in substantial losses or created a significant risk of substantial losses to other persons" such that a third-tier penalty is warranted. 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). Some courts infer that a "significant risk" of loss exists whenever a fraudulent statement would have been important to a reasonable investor; others require concrete evidence that there has been substantial losses or risk of loss. *See Madsen*, 2018 WL 5023945, at *3–4. Although it is not clear from the Complaint the extent to which investors suffered substantial losses from Clarke's fraud, the Complaint makes clear that Clarke's conduct contributed to there being substantial

profits to participants in the scheme (even if not to himself personally). The Court need not wade into the debate about whether this evidence is sufficient to justify a third-tier penalty for the purposes of this motion, because the Court concludes that a third-tier penalty is not warranted for other reasons.

The allegations in the Complaint show, and the SEC does not dispute, that Shah was more culpable than Clarke; the small sums that the SEC has been able to trace to Clarke (relative to the millions of dollars of illegal proceeds alleged in the Complaint) tend to support the conclusion that Clarke was a minor participant. Although Clarke's conduct was intentional and fraudulent, it is not clear the extent to which Clarke, as a Canadian citizen seemingly following the instructions of the Sharp Group, had the specific awareness that he was violating U.S. law. Importantly, Clarke's conduct after the Complaint was filed demonstrates that he has accepted responsibility and suggests that he is not at substantial risk of recidivating; Clarke voluntarily accepted service of the Complaint from outside the United States and quickly agreed to a consent decree. The Court recognizes the importance of these post-Complaint actions in its decision to deviate downward from the maximum permissible civil penalties. Finally, Clarke's personal financial circumstances suggest that a more limited penalty would have a significant deterrent effect. Taking these factors into account, but also recognizing the nature of Clarke's conduct and the importance of general deterrence, the Court imposes a civil penalty of $10,000, slightly below the maximum for a first-tier violation. *See SEC v. Syndicated Food Service Intern., Inc.*, 2014 WL 1311442, at *27 (E.D.N.Y. Mar. 28, 2014) (imposing a single tier-one penalty on a defendant who "reaped commensurately small rewards" and "enter[ed] into a consent agreement . . . which reflects his willingness to be held responsible for his actions").

**CONCLUSION**

The SEC's motion for civil penalties and disgorgement against Clarke is GRANTED.

The Court imposes disgorgement of $45,234 plus prejudgment interest of $9,177 and a civil

penalty of $10,000.


SO ORDERED.


Dated: December 28, 2022
      New York, New York                                                LEWIS J. LIMAN
                                                   United States District Judge